[No. 57551-7. En Banc. June 11, 1992.]

THE STATE OF WASHINGTON, *Respondent,* v. MARIO ORTIZ, *Appellant.*

*Helen A. Anderson* of *Washington Appellate Defender Association*, for appellant.

*David S. McEachran, Prosecuting Attorney*, for respondent.

DURHAM, J. — Mario Ortiz appeals his aggravated first degree murder conviction following a third jury trial. Upon consideration of his claims, we affirm his conviction.

Mario Ortiz was convicted of aggravated first degree murder for the rape and murder of Fannie Slotemaker. The victim's body was discovered wrapped in blankets in a bedroom of her house. She had been stabbed several times in her throat, arm, chest and abdomen, and there were defensive wounds on her arms. Her face had been crushed. After she had been stabbed, she was dragged from room to room, probably by her hair. The victim had also been raped. When her body was discovered, she was naked from the waist up, but a pair of slacks had been put on her. There was a laceration in the opening to her vagina. The victim was 77 years old.

The knife used as the murder weapon had been taken from the victim's kitchen. The murderer left extensive bloody shoe prints throughout the scene which indicated that only one perpetrator was involved.

While investigating the scene, the police called in Joel Hardin, an agent with the United States Border Patrol. Hardin has extensive experience tracking human beings. He is the most senior tracker in the Border Patrol and has tracked over 5,000 people during his career. Hardin testified that his observations of the victim's house indicated that only one person other than the victim was present. He followed the trail left by that person across a field and through

a raspberry patch to the housing development where Ortiz lived.

Hardin testified that he was able to tell that the person he was following was between 5 feet 7 inches and 5 feet 8 inches in height, and weighed 140 to 160 pounds. In addition, he said that he could tell that the suspect was familiar with raspberry bushes by the manner in which he avoided wire supports. He also observed that the person had probably been approached by a dog and had reassured that dog. On cross examination, Hardin testified that he had made the determination that he was tracking a young Mexican male, and said that this conclusion was based on his interpretation of the trail.

The Whatcom County Deputy Medical Examiner, Dr. Gibb, performed an autopsy. He obtained fluid samples from the victim's vagina and discovered spermatozoa and acid phosphatase in the samples, which indicated that intercourse had occurred.

The vaginal samples collected from the victim's body were diluted with saline, frozen by Dr. Gibb and turned over to the police. They sent the samples, along with other evidence in this case, to the Federal Bureau of Investigation Laboratory in Washington, D.C., by parcel post registered mail shortly after receiving them. The samples had thawed when they were received and were refrigerated. They were not examined for almost 2 months from the time they were collected. When the specimens were examined, they were not suitable for testing due to putrefaction from bacterial growth.

Both the defendant and the victim have type O blood, and the defendant is a secretor. Based on that information, and statistical data about the general population, the court concluded that there is a 55 to 60 percent chance that someone other than Ortiz could have been the contributor of the semen found in the victim.

Ortiz was arrested in Othello a few days after the murder on different charges. On the way to the police station, with no prompting or questioning, Ortiz said, "I didn't want to

screw the old lady. She wanted to screw me." This statement motivated the police to question Ortiz further and he made other incriminating statements. Upon further investigation, Ortiz was charged in June 1981. He was ruled competent to stand trial, and following a jury trial in November 1981, was found guilty of murder. On appeal, the conviction was reversed due to the improper admission of rebuttal evidence. *State v. Ortiz*, 34 Wn. App. 694, 664 P.2d 1267, *review denied*, 100 Wn.2d 1017 (1983).

A second competency hearing was held prior to defendant's next trial, and Ortiz was found competent. Ortiz was again convicted of aggravated murder in the first degree, but the trial court declared a mistrial due to juror misconduct.[1]

After the trial was set for a third time, Ortiz brought an interlocutory appeal to this court to have certain evidence suppressed and to have a determination made on his competency. We held that the trial court had not abused its discretion when it found Ortiz competent to stand trial. *State v. Ortiz*, 104 Wn.2d 479, 484, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986). We also refused to suppress evidence obtained following Ortiz' lawful arrest, including the statement made on the way to the police station. *Ortiz*, 104 Wn.2d at 484-85.

Prior to his third trial, in September 1986, a final competency hearing was held at defendant's request. Extensive testimony was taken, including testimony from the defendant. It was clear from all the testimony that Ortiz' abilities are very minimal due to his mental retardation. While acknowledging that it may have found otherwise in the first instance, the trial court concluded that no change in Ortiz' condition had been demonstrated and, therefore, our prior decision on competency was binding.

After another interlocutory appeal was denied, a third trial was held in October 1988. The jury returned a guilty

---

[1]The jury had discovered Ortiz' prior conviction, and the nature of the inadmissible statements which were the basis of the first appeal.

verdict, and the trial court entered judgment and sentence. Ortiz appealed, and the Court of Appeals certified the case to this court.

A number of issues are raised. First, we must again consider Ortiz' competency. Second, Ortiz claims that the State's failure to preserve potentially exculpatory evidence requires dismissal. Third, we determine if Hardin's testimony regarding tracking was properly admitted. Fourth, the sufficiency of the evidence to support the element of premeditation is challenged. Fifth, Ortiz claims that he was entitled to an instruction of second degree murder as a lesser included offense. Finally, we examine the trial court's exclusion of evidence of a similar crime. On each issue, we affirm the trial court.

## COMPETENCY

Ortiz argues that the trial court erred when it refused to find him incompetent to stand trial. A person is competent to stand trial if he has the capacity to understand the nature of the proceedings against him and can assist in his defense. *State v. Hahn*, 106 Wn.2d 885, 894, 726 P.2d 25 (1986); RCW 10.77.010(6); RCW 10.77.050.

In *State v. Ortiz*, 104 Wn.2d at 483-84, this court held that Ortiz was indeed competent to stand trial:

> [W]e hold that the trial court was correct in using the traditional analysis for determining competency and thus did not abuse its discretion in finding that petitioner was competent to stand trial. We note that other jurisdictions have held persons with similar IQ's competent to stand trial.

We acknowledged the trial court's finding that both requirements of the 2-part test were met, and rejected Ortiz' argument that a more stringent test should be adopted.

■ Upon remand, the trial court held a third competency hearing in September 1986, and entered a written memorandum decision on September 25, 1986. The court refused to exercise its discretion, and instead made the following decision:

> Having implicitly weighed all the factors which went into the trial courts' decisions, the Supreme Court sustained those

holdings. This Court cannot, then, take a different stance unless it can be said that new information presented has altered the *status quo ante*.

Supplemental Clerk's Papers, at 136. This reasoning is sound. Ortiz claimed incompetency based on mental retardation, but did not produce any evidence that his condition had changed since his previous competency hearings. Based on the finding that there had been no significant change, the trial court correctly denied Ortiz' motion.

### EXCULPATORY EVIDENCE

Ortiz argues that the State's failure to preserve potentially exculpatory evidence was an error of such magnitude that dismissal is mandated. The trial court found that because the semen samples collected by Dr. Gibb from the victim were not properly preserved through either freezing or drying, the samples putrefied from bacterial growth. The samples were probably fit for blood group testing when collected, and there was a 55 to 60 percent chance that such tests would yield a blood type other than that of Ortiz, based on the distribution of blood types in the population. The court also found that there was a reasonable possibility that the samples would have been exculpatory. The trial court concluded, however, that the State had acted reasonably and in good faith, and had made earnest efforts to preserve the samples, and refused to dismiss.

To determine if a failure to preserve exculpatory evidence amounts to a denial of due process, we apply the standard recently set forth in *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). In that case, the defendant was convicted of child molestation, sexual assault and kidnapping. *Youngblood*, at 52. The State negligently failed to preserve semen samples that were collected from the victim and his clothing, and tests which could have exonerated the defendant were not performed. *Youngblood*, at 53-54. In reinstating the conviction, the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially

useful evidence does not constitute a denial of due process of law." *Youngblood,* at 58.

Here, the trial court found that the State had handled the samples in the usual manner and concluded that the State had acted reasonably and in good faith. There is substantial evidence in the record to support this finding. Nothing indicates that the State had intentionally destroyed the evidence nor that any attempt was made to conceal it from the defendant. Although it may have been possible to preserve the evidence had it been handled more carefully, the State dealt with the storage and transportation of the evidence in its usual manner. In the absence of bad faith, the failure to preserve the semen samples for potentially exculpatory testing is not a violation of due process.

Ortiz argues, however, that the Washington due process clause, Const. art. 1, § 3, affords broader due process protection than the Fourteenth Amendment. Although we recently held that Washington case law regarding potentially exculpatory evidence had been overturned by United States Supreme Court decisions, *State v. Straka,* 116 Wn.2d 859, 883, 810 P.2d 888 (1991), the defendants there did not argue that a due process analysis under the state constitution should be considered. Here, we are presented for the first time with such a claim.

In *State v. Gunwall,* 106 Wn.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986), this court enumerated six nonexclusive neutral criteria that must be addressed before we will undertake state constitutional analysis: (1) the textual language of the state constitution; (2) significant differences in the texts of parallel provisions; (3) state constitutional history; (4) preexisting state law; (5) structural differences between the federal and state constitutions; and (6) matters of particular state interest and local concern.

Several of these factors are not in dispute here. First, Const. art. 1, § 3 provides: "No person shall be deprived of life, liberty, or property, without due process of law." No

further elaboration is provided. Second, this language is nearly identical to the federal provisions.[2] Third, no legislative history has been shown which would provide a justification for interpreting the identical provisions differently. *See Journal of the Washington State Constitutional Convention, 1889,* at 495-96 (B. Rosenow ed. 1962). Analysis of the fifth *Gunwall* factor may support the notion that our constitution is more protective in a general sense but does not shed any light on this particular issue. *Gunwall,* at 66. Sixth, Ortiz argues cursorily that state law enforcement is always a local matter, but again, that factor does not aid in the analysis of this particular question.

The fourth *Gunwall* factor, consideration of pre-existing state law, requires closer analysis. Ortiz argues that we should retain the standard adopted in *State v. Vaster,* 99 Wn.2d 44, 659 P.2d 528 (1983). *Vaster* also concerned the failure to preserve vaginal samples which could have been exculpatory. The court there set forth a 2-part test for cases where there has been a good faith loss of evidence. The defendant must first show that there is a reasonable possibility that the evidence would affect the defense, and then the court must balance that possibility against the ability of the prosecution to have preserved the evidence. *Vaster,* at 52; *State v. Judge,* 100 Wn.2d 706, 717, 675 P.2d 219 (1984). *Vaster* extended the protection afforded under *State v. Wright,* 87 Wn.2d 783, 790-91, 557 P.2d 1 (1976), which dealt with the dismissal of a murder case where the State had destroyed virtually all the physical evidence.

In *State v. Straka, supra,* this court unanimously held that *Vaster* and *Wright* had been overruled by federal law.[3] We noted that both cases explicate federal constitutional

---

[2]The fifth amendment to the United States Constitution provides in part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . ."; the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law . . .".

[3]Justices Utter and Smith filed separate dissenting opinions on other issues.

principles,[4] and concluded that they were thus supplanted by subsequent decisions of the Supreme Court. *Straka*, at 883. Since *Vaster* and *Wright* did not provide independent reasons under state law for their holdings, these cases offer no support for Ortiz' contention that the state constitution is broader than the federal.

Additional authority exists for the proposition that our law in this area is coextensive with federal requirements. *Seattle v. Duncan*, 44 Wn. App. 735, 743, 723 P.2d 1156 (1986). In *Duncan*, the defendant argued that the state constitution provides more protection than the federal provisions relied on in *Vaster*. *Duncan*, at 742. Although it did not consider *Gunwall*, the court rejected the proposed distinction. It reasoned that the language of the provisions was virtually identical, and that no analytic basis existed to interpret our due process clause more broadly than the federal provisions. *Duncan*, at 742-43.

Ortiz also argues that Const. art. 1, § 3 has already been interpreted more broadly than the federal due process clauses in *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) and in *State v. Davis*, 38 Wn. App. 600, 686 P.2d 1143 (1984). However, neither of those cases concerned the right asserted here to discover potentially exculpatory evidence. *Bartholomew* held that the state due process clause requires that the rules of evidence be applied to capital sentencing proceedings. *Davis* held that, unlike the federal constitution, the state constitution did not allow comment on defendant's post-arrest silence even if defendant has not

---

[4]In *Wright*, the court relied on *United States v. Bryant*, 439 F.2d 642, 644 (D.C. Cir. 1971), for the holding that a defendant's due process rights are violated when the prosecution fails to fulfill its duty to preserve evidence if there is a reasonable possibility that the evidence was material and favorable to the defendant. The *Wright* opinion does not cite any Washington law on the subject. *Wright*, at 788. In *Vaster*, the court stated explicitly that the duty to preserve evidence is derived from *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), which held that there is a duty to disclose exculpatory evidence under the due process clause. *Vaster*, at 49. The court also expressly adopted the federal standard expressed in *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). *Vaster*, at 50.

received *Miranda* warnings. This case concerns a different application of due process.

We hold that *Youngblood* provides the proper standard for the preservation of exculpatory evidence. Applying *Youngblood* to the case before us, it is clear that there was no due process violation.

It is noteworthy, however, that even if the *Vaster* test were applied, Ortiz' conviction would be affirmed. The State's duty to preserve material evidence is derived from the duty to disclose exculpatory evidence as expressed in *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). In *Brady*, the Court held that a state is required, by due process concerns, to disclose evidence material to the issue of guilt or innocence. In *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the Court set forth three distinct suppression situations. First, if prosecutorial misconduct is involved, a conviction "must be set aside if there is any reasonable likelihood" that the undisclosed evidence could have affected the jury's decision. *Agurs*, 427 U.S. at 103. Next, where the defense has made a specific pretrial request for evidence, the court asks if "the suppressed evidence might have affected the outcome". *Agurs*, at 104. Finally, where only a general discovery request, or no request at all, has been made, the State has a duty to disclose evidence only if the "evidence creates a reasonable doubt that did not otherwise exist". *Agurs*, at 112; *see generally State v. Laureano*, 101 Wn.2d 745, 682 P.2d 889 (1984).

In *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976), this court recognized that the duty to preserve evidence applied to the loss or destruction of material evidence by the government. The court noted that cases involving the loss or destruction of evidence "pose a significantly different problem than the traditional nondisclosure cases in which the suppressed evidence is still in existence." *Laureano*, at 760 (citing *Wright*, at 787-89). Next, in *State v. Vaster*, *supra*, we explained and analyzed the factors to be considered in dealing with the inadvertent or good faith loss or

destruction of evidence by the State. Finally, in *State v. Laureano*, *supra* at 760, this court refined the *Vaster* standard for preservation of evidence:

> The *Vaster* court ruled under these circumstances the defendant has the burden of showing there is a reasonable possibility the missing evidence would have affected his ability to present a defense. *Vaster*, 99 Wn.2d at 52. If such a reasonable possibility is found, this must be balanced by the court against the ability of the prosecution to have preserved the evidence (considering the procedures established for preserving evidence), the nature of the missing evidence, and the circumstances surrounding its loss.

Both *Vaster* and *Laureano* require that the missing evidence be material to guilt or innocence, in accordance with the *Brady* standard.

Here, the missing evidence consists of semen taken from the victim's body. Based solely on the frequency of blood types in the population, there is a 55 to 60 percent chance that the semen could have been of a different type than that of Ortiz. It is not clear, however, that the semen sample was suitable for testing when it was collected from the victim. The coroner, Dr. Gibb, testified that the body had already begun to decompose when it was found, and that bacterial growth had occurred. The FBI expert responsible for testing hypothesized that, in 2 days, putrefaction could occur. Moreover, the murder took place at the end of May, when warm temperatures would likely speed decay. Thus, although taken alone the frequency of blood types presents a clear possibility that the evidence here could be exculpatory, under the circumstances presented, it is less certain that the evidence obtained would help the defendant. Nevertheless, some "reasonable possibility" remains that the evidence would tend to exculpate Ortiz, and it should, therefore, be considered material.

In light of the overall evidence presented against Ortiz, however, this possibility is remote. Both circumstantial and direct evidence link Ortiz to the crime. A neighbor of the murder victim positively identified Ortiz as the man who had tried to get into her house at 5 a.m. on the morning of

the murder. The track leading away from the murder site led to the housing development where Ortiz lived, and indicated that someone of his height and weight had committed the crime. The shoe-print patterns found sealed in the victim's blood matched both of Ortiz' shoes precisely — they were made from the same mold and had the same wear characteristics. Moreover, traces of human blood were found on Ortiz' shoe. A hair similar to that of Ortiz was found on the arm of the victim. Finally, Ortiz made incriminating statements when he was arrested in another town on an unrelated incident several days later.[5]

When this possibility is measured against the actions of the State, it is insufficient to warrant a new trial. We examine the nature of the evidence, the ability to preserve that evidence, and the circumstances surrounding its loss. *Laureano*, at 760. Evidence of the type here is quite fragile, and not always easily preserved. Throughout the process, the State acted in accordance with its usual procedures. The semen was initially frozen, then shipped in the usual fashion, and then refrigerated until examined. No showing, nor indeed even an allegation, of bad faith on the part of the police or the prosecution has been made. The results of the testing that was done, as well as the fact of the putrefaction, were made available to the defense — there was no failure to disclose information here.

Moreover, it is clear from a review of the entire record in this case that Ortiz received a fair trial. In any trial, both the State and the defense pick and choose the evidence to be presented, and the lack of any one piece of evidence should not determine the outcome. Of course in circumstances where the entire body of material evidence in a case has been disposed of, *see Wright*, at 784-86, dismissal is warranted. Here, only one piece of evidence is missing, the jury was informed of the error, and the State did not receive any benefit from the evidence prior to its loss. Three separate

---

[5]The dissent's conjecture about Ortiz' mental state at the time the statements were made is totally baseless.

juries have found Ortiz guilty of this brutal crime, and we have no doubt that he in fact committed it. In the absence of any misconduct, and with no possibility that an innocent person is being wrongfully accused, we see no reason to dismiss the charges on this basis.

## Opinion Testimony

■ Ortiz argues that the trial court incorrectly admitted Joel Hardin's testimony regarding the defendant's height and weight, his mental state, his familiarity with the terrain and with raspberry bushes, and other testimony beyond his observations about the physical conditions he observed about the track left in the field.[6] He contends that Hardin's testimony should not have been admitted because it was neither proper lay opinion evidence, nor proper expert testimony. We review only for an abuse of discretion. 5 K. Tegland, Wash. Prac., *Evidence* § 14, at 63 (3d ed. 1989).

The trial court determined that the evidence was admissible as lay opinion, and that it was not scientific evidence. No reported case deals with the admissibility of testimony by a tracker. We agree, however, with the trial court's conclusion.

■ A lay witness may testify as to his or her opinion in certain circumstances. ER 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

The appropriate conditions for admissibility have been explained as follows:

> Under Rule 701 and Rule 602, the witness must have personal knowledge of matter that forms the basis of testimony of

---

[6] Initially, the State argues that Ortiz failed to object properly and, therefore, waived the right to raise the issue on appeal. Ortiz, however, did make a motion in limine to exclude Hardin's testimony, which was denied. Ortiz also made a motion to strike portions of Hardin's testimony. We have said that "[u]nless the trial court indicates that further objections at trial are required when making its ruling, the party losing the pretrial motion is deemed to have a standing objection." *State v. Koloske*, 100 Wn.2d 889, 895, 676 P.2d 456 (1984). Thus, the objection was timely made.

opinion; the testimony must be based rationally upon the perception of the witness; and of course, the opinion must be helpful to the jury (the principal test).

(Footnotes omitted.) E. Cleary, *McCormick on Evidence* 29 (3d ed. 1984).

Here, Hardin had gone to the crime scene and investigated the victim's house and the raspberry field behind her house. His testimony was therefore based on personal knowledge. Hardin's opinions about the perpetrator's size and movements were founded on his ample experience as a tracker. He carefully explained how he had learned his craft, and the particulars of the methods he used. His perceptions in the field formed a rational basis for the inferences presented in his testimony.

Moreover, this evidence was found to be helpful by the court. Hardin's testimony established that there had only been one perpetrator and portrayed what had happened after the murder. It also provided a physical description consistent with that of the defendant. Hardin did not attempt to identify the defendant conclusively, but merely testified as to his findings in the field. In addition, his testimony was corroborated by a neighbor who heard a barking dog from the direction of the raspberry field and by the discovery of the murder weapon along the trail. These inferences could not have been made by the jury alone based on testimony which was limited to Hardin's sensory impressions. Instead, Hardin's opinions about the proper interpretation of the physical trail were a necessary aid to the jury. The court did not abuse its discretion when it admitted the evidence.

■ Moreover, the trial court's ruling can also be affirmed if the evidence is analyzed as expert testimony under ER 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The decision to admit expert testimony is within the discretion of the trial court. *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990), *cert. denied*, 111 S. Ct. 752 (1991). Expert testimony will be admitted when " '(1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact.' " *Swan*, at 655 (quoting *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984)).

■ Hardin was clearly qualified to testify. Practical experience is sufficient to qualify a witness as an expert. *State v. Smith*, 88 Wn.2d 639, 647, 564 P.2d 1154 (1977). Hardin has extensive training and experience as a tracker. For 23 years, he has worked as a special agent with the United States Border Patrol as an expert tracker and as a trainer and instructor in his field. For 8 of those 23 years, he was stationed on the Mexican border. He has been qualified as an expert by National Search and Rescue, which requires 8,000 to 10,000 hours of experience, as well as the United States Border Patrol, the United States Marshall's Service, and the Federal Bureau of Investigation. Courts in California and Washington have previously recognized his expert status.

Hardin has direct experience tracking approximately 5,000 people. He was involved in a team organized by the United States Marshall's office to track Christopher Boyce. He was also called in to assist in the Green River murder investigation and was later proven to have made an accurate determination that a body had been disposed of 18 months earlier. He successfully tracked Martin Ray Baker after he shot a customs agent, despite Baker's training as a military special forces member and his ability to camouflage his trail.

■ Ortiz argues that Hardin's testimony was improperly admitted under the standard set forth by *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923). Testimony based on scientific experimental procedures is admissible only if the background theory or principle has achieved

general acceptance in the scientific community. *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984) (citing *Frye*, at 1014). However, testimony which does not involve new methods of proof or new scientific principles from which conclusions are drawn need not be subjected to the *Frye* test. *State v. Young*, 62 Wn. App. 895, 906, 802 P.2d 829, 817 P.2d 412 (1991). Hardin's testimony was not based on novel scientific experimental procedures, but rather upon his own practical experience and acquired knowledge. Moreover, no particularized background knowledge would be necessary to an understanding of the evidence Hardin presented. The *Frye* test does not apply.

Further, the testimony was not so technical that a jury could not judge its reliability for itself. A videotape was shown which featured Hardin entitled "Tracking Awareness: The Art of Sign Cutting" to illustrate the methodology employed. Again and again, in his testimony and on the tape, Hardin emphasized that sign cutting, or tracking, is an acquired body of knowledge based on experience in the field. In addition, Hardin's testimony was subject to cross examination on the basis for his conclusions. By viewing the tape and listening to Hardin's testimony and cross examination, the jurors could form their own opinion about the reliability of his conclusions. It was for the jury to decide what weight should be attached to Hardin's testimony.

The evidence here meets the criteria for admissibility of expert testimony. Hardin was qualified to testify as an expert, the testimony was sufficiently reliable, and it was helpful to the jury. The testimony was properly admitted under either standard.

## PREMEDITATION

Ortiz argues that the State failed to establish sufficient evidence of premeditation necessary for aggravated first degree murder. *State v. Bingham*, 105 Wn.2d 820, 719 P.2d 109 (1986); RCW 10.95.020. The standard of review when examining a jury verdict in a criminal case is " 'whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Bingham*, at 823 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)).

Premeditation must involve "more than a moment in point of time." RCW 9A.32.020(1).

> Premeditation has been defined as "the deliberate formation of and reflection upon the intent to take a human life", *State v. Robtoy*, 98 Wn.2d 30, 43, 653 P.2d 284 (1982), and involves "the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *Brooks*, at 876.

*State v. Ollens*, 107 Wn.2d 848, 850, 733 P.2d 984 (1987) (quoting *State v. Brooks*, 97 Wn.2d 873, 876, 651 P.2d 217 (1982)). This court has previously adopted the view expressed in *Austin v. United States*, 382 F.2d 129, 139 (D.C. Cir. 1967), that, standing alone, multiple wounds and sustained violence cannot support an inference of premeditation. In *Bingham*, we held that there was not sufficient evidence of premeditation in a murder by strangulation. We reasoned that "to allow a finding of premeditation only because the act takes an appreciable amount of time obliterates the distinction between first and second degree murder." *Bingham*, 105 Wn.2d at 826.

In *Ollens*, however, we distinguished *Bingham* and held that there was sufficient evidence to find premeditation. *Ollens*, 107 Wn.2d at 853. We relied on four characteristics. In *Bingham*, the murder was committed by strangulation, which involves one continuous act, whereas in *Ollens* the victim was stabbed numerous times and, thereafter, the victim's throat was slashed. Second, in *Ollens* a knife was used, which required procurement of a weapon. Third, the victim was struck from behind. Fourth, there was evidence of a motive of robbery. *Ollens*, at 853.

Here, there are similar distinguishing characteristics. The killing was committed with a knife and multiple

wounds were inflicted. Although the knife was procured on the premises, the jury could have found that the act of obtaining the knife involved deliberation. Moreover, the murder occurred in a bedroom, and not in the kitchen where the knife was found. The victim was struck in the face with something other than the knife. Finally, the defensive wounds found on the victim indicate a prolonged struggle. In light of all these factors, we hold that there was sufficient evidence to convict.

### LESSER INCLUDED OFFENSE INSTRUCTION

Ortiz argues that the jury should have been instructed on second degree murder. An instruction for a lesser included offense must be given by the trial court "when each element of the lesser included offense must be a necessary element of the offense charged, and when the evidence in the case supports an inference that the lesser included crime was committed." *State v. Fowler*, 114 Wn.2d 59, 67, 785 P.2d 808 (1990) (citing *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978)). The defendant must point to some evidence that would support an alternative theory on the lesser included offense and may not merely rely on the possibility that the jury could disbelieve the State's evidence. *Fowler*, at 67.

Premeditated murder in the first degree contains the following elements: (1) the defendant caused the death of the victim; (2) the defendant intended to cause the death; (3) the intent to cause the death was premeditated. RCW 9A.32-.030. Aggravated first degree murder is premeditated murder in the first degree, which is accompanied by one or more of the statutory aggravating circumstances, one of which is that the murder was committed in the course of a rape. *State v. Irizarry*, 111 Wn.2d 591, 593-94, 763 P.2d 432 (1988); RCW 10.95.020.

Murder in the second degree contains these elements: (1) the defendant caused the death of the victim; (2) the defendant intended to cause the death of the victim, but without

premeditation. RCW 9A.32.050. Since all the elements of second degree murder are also elements of first degree murder, the first prong of the *Fowler* test is met.

The second prong of the *Fowler* test was not met, however. There is no evidence to support an inference that second degree murder was committed. *Fowler*, at 67. It was unrefuted that a rape was committed. Moreover, the same person must have committed the rape and the murder, as evidenced by the footprints sealed in blood. Thus, at the very least, the crime that was committed was felony murder. Second degree murder is not supported by the evidence.

■ Ortiz argues that felony murder is not a lesser included offense of aggravated first degree murder. This is correct. There are three types of first degree murder — premeditated murder, murder by extreme indifference to human life, and felony murder. RCW 9A.32.030. Aggravated first degree murder, as explained above, is premeditated first degree murder plus an aggravating circumstance. The rape, in this instance, is not an *element* of the crime. *Irizarry*, at 594. Therefore, felony murder is not a lesser included offense of aggravated murder. *Irizarry*, at 595. Indeed, although the trial court did give the instruction for felony murder, it acknowledged that felony murder was not exactly a lesser included offense. The defendant did not object, however, and explicitly accepted the instruction. Moreover, the defendant was not convicted of felony murder but of the greatest possible offense. He cannot now complain that the instruction should not have been given.

Finally, the fact that felony murder is not a lesser included offense of aggravated first degree murder has no bearing on the question of whether the defendant was entitled to an instruction on second degree murder. Examination of the actual facts of this case shows that first degree murder, in one form or the other, was committed.

## EXCLUDED EVIDENCE

Ortiz sought to have evidence admitted of another rape which had been committed in Lynden 6 months earlier. The

victim there was also 77 years old and had been dragged from one room to another. She, too, was raped in her home, but managed to escape. The victim would have testified that Ortiz was not her assailant.

To introduce evidence that a similar crime was committed by a different person, the defendant must show a connection between the two crimes. *State v. Mak*, 105 Wn.2d 692, 716, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). Here, Ortiz submitted evidence that there were several general similarities between the 2 crimes, that it is rare for a woman over 65 to be raped, and that there had only been 3 rapes in Lynden in the past 20 years. The trial court did not abuse its discretion in refusing to admit the evidence, however, since there were also marked differences between the cases, including the murder of the victim. Absent a manifest abuse of discretion, we will not overturn the trial court's decision.

In sum, finding no error, we affirm the defendant's conviction.

BRACHTENBACH, ANDERSEN, and GUY, JJ., concur.

DOLLIVER, J. (concurring) — I would affirm the conviction based on the majority opinion, which states either the *Youngblood* test (*Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988)) or the *Vaster* test (*State v. Vaster*, 99 Wn.2d 44, 659 P.2d 528 (1983)) would apply. This being so, I see no need to decide here whether under the due process clause in the state constitution (Const. art. 1, § 3) the *Vaster* analysis can be maintained.

JOHNSON, J. (dissenting) — This case presents a question of first impression: In deciding whether a criminal defendant's rights to due process and a fair trial are violated when the government fails to preserve potentially exculpatory evidence, should we follow the Supreme Court's analysis of the federal constitution in *Arizona v. Youngblood*, 488 U.S. 51,

102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), or should we instead expressly adopt an independent interpretation of Washington's state constitution and apply the more protective analysis this court previously developed in *State v. Vaster,* 99 Wn.2d 44, 659 P.2d 528 (1983)? Once the proper test is determined, we must then decide if Mario Ortiz's rights to due process and a fair trial were violated.

The majority rejects an independent state constitutional analysis and finds no violation of the defendant's constitutional rights. I disagree with the majority on both points. I would expressly adopt *Vaster* as an interpretation of the state constitution and would conclude the State violated Ortiz's constitutional rights.

## I

At issue here is a criminal defendant's constitutional due process right to a fair trial. *See Vaster,* at 54. In 1983, this court set forth the proper test for evaluating the due process implications of the State's failure to preserve potentially exculpatory evidence. *State v. Vaster, supra.* Under that test, the court examines first the likelihood that the destroyed evidence would have been exculpatory to the defendant. If a review of all the circumstances reveals a "reasonable possibility" that the evidence would have been exculpatory, then the court weighs that possibility against the State's ability to preserve that evidence. *Vaster,* at 52. These principles fully account for the competing interests of the defendant and the State.

The majority, however, applies the analysis developed by the Supreme Court in *Youngblood. Youngblood,* decided 5 years after *Vaster,* holds that due process is violated only if the defendant shows that the State's failure to preserve potentially exculpatory evidence was an act of bad faith. *Youngblood,* at 58. The Court thereby entirely eliminated from the previously well-accepted analysis the materiality of the destroyed evidence and its effect on the defendant's

ability to present a case. Under *Youngblood*, even if the State's case against the accused hinges almost entirely on the destroyed evidence, and even if the evidence is likely to exonerate the defendant, the due process clause of the United States Constitution is not violated unless the defendant can show bad faith.

This standard defies logic. We recognized as much in 1976 when we unanimously rejected the same bad faith standard that was eventually adopted by the Court in *Youngblood*:

> [I]n destruction of evidence cases, as in true suppression cases to which they are closely analogous, the motive of those destroying the items is not determinative. The purpose of the duty of preservation is not to punish the police, but to insure a fair trial for the accused.

*State v. Wright*, 87 Wn.2d 783, 791, 557 P.2d 1 (1976).

Simply put, "the absence of bad faith does not end the analysis", for "police actions taken in bad faith are not the only species of police conduct that can result in a violation of due process". *Youngblood*, at 65-66 (Blackmun, J., dissenting). Rather, the proper analysis is to determine whether the destroyed evidence was "so critical to the defense as to make a criminal trial fundamentally unfair". *Youngblood*, at 61 (Stevens, J., concurring). By eliminating this crucial element of the analysis, *Youngblood* transforms the constitutional right to a fair trial into nothing more than a " 'good faith' try at a fair trial". *Youngblood*, at 61 (Blackmun, J., dissenting).

Nor is this the only problematic aspect of *Youngblood*. It places defendants in the nearly impossible position of having to prove the State's failure to preserve evidence was an act of bad faith. *See Youngblood*, at 69; *State v. Richard*, 798 S.W.2d 468, 471 (Mo. Ct. App. 1990). All of the facts are in the State's possession, not the defendant's, yet the defendant must prove not only what happened to the evidence but also what motivated the governmental agents. The severity of this burden renders the protections of due process all but illusory.

Additionally, *Youngblood*'s apparent goal of establishing a bright-line rule will likely not be realized:

Apart from the inherent difficulty a defendant would have in obtaining evidence to show a lack of good faith, the line between "good faith" and "bad faith" is anything but bright, and the majority's formulation may well create more questions than it answers. What constitutes bad faith for these purposes? Does a defendant have to show actual malice, or would recklessness, or the deliberate failure to establish standards for maintaining and preserving evidence, be sufficient? Does "good faith police work" require a certain minimum of diligence, or will a lazy officer, who does not walk the few extra steps to the evidence refrigerator, be considered to be acting in good faith? While the majority leaves these questions for another day, its quick embrace of a bad-faith standard has not brightened the line; it only has moved the line so as to provide fewer protections for criminal defendants.

*Youngblood*, at 66-67 (Blackmun, J., dissenting).

*Youngblood*'s thesis is clear — fundamental fairness in a criminal trial matters less than administrative convenience to the State. I cannot agree.

II

We should not analyze this case under *Youngblood*'s interpretation of the federal constitution. We are committed to deciding questions of state constitutional law first, before addressing the federal constitution, in order to determine if the state constitution provides greater rights. *See Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988); *O'Day v. King Cy.*, 109 Wn.2d 796, 801-02, 749 P.2d 142 (1988). The state constitution should control this case.

*Vaster*'s analysis is phrased only in general terms of due process; its language does not indicate whether it is interpreting due process under the state constitution or under the federal constitution. For the sake of maintaining continuity in the law of this State, this court should interpret *Vaster*'s ambiguous language as representing analysis of the state constitution. Thus, *Youngblood* would not require this court to abandon *Vaster*.

My dissent, however, does not depend on this interpretation of *Vaster*. Even if one accepts the majority's characteri-

zation of *Vaster* as representing an interpretation of federal law, it still leaves open the question of the proper interpretation under the state constitution. This question was left unanswered in two recent cases. *See State v. Lord*, 117 Wn.2d 829, 867 n.9, 822 P.2d 177 (1991); *State v. Straka*, 116 Wn.2d 859, 883, 810 P.2d 888 (1991).

State constitutional analysis begins with analysis of the factors set out in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986), to determine what an independent interpretation of the state constitution will yield. The nonexclusive *Gunwall* factors include: (1) the textual language of the state constitution; (2) significant differences in the texts of the parallel provisions; (3) state constitutional and common law history; (4) preexisting state law; (5) structural differences between the federal and state constitutions; and (6) matters of particular state interest and local concern. *Gunwall*, at 61-62.

The state constitution provides: "No person shall be deprived of life, liberty, or property, without due process of law." Const. art. 1, § 3. This language is similar to that contained in the federal constitution.[7] This similarity, however, does not preclude independent interpretation. Even *identical* provisions should be viewed in light of what the language meant to the framers at the time our constitution was adopted in 1889. They should be interpreted independently unless historical evidence shows the framers intended otherwise. *See* Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. Puget Sound L. Rev. 491, 514-16 (1984). The parties have not presented any historical evidence on this point. Thus, the first three factors suggest independent interpretation.

The fourth *Gunwall* factor, preexisting state law, provides crucial support to this conclusion. Washington courts have

---

[7]*See* U.S. Const. amend. 5 ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . ."); U.S. Const. amend. 14, § 1 ("No state shall . . . deprive any person of life, liberty, or property, without due process of law . . .").

already held that the state due process clause is subject to a broader interpretation than the federal clause. *See State v. Bartholomew*, 101 Wn.2d 631, 639-44, 683 P.2d 1079 (1984); *State v. Davis*, 38 Wn. App. 600, 604-06, 686 P.2d 1143 (1984). Additionally, in the very area of law that is raised in this case — due process violations arising from the State's failure to preserve potentially exculpatory evidence — we long ago rejected the bad faith test established in *Youngblood*. *Wright*, at 791-92. We have instead developed a test that depends primarily on the materiality of the lost evidence and the effect that its loss has on the fairness of the trial. *Vaster*, at 52; *Wright*, at 792. Preexisting law strongly favors an independent interpretation of the state due process clause.

The fifth and sixth factors also point to independent interpretation. Structurally, the federal constitution represents a *grant* of power from the states, while the state constitution represents a *limitation* of the State's power. *Gunwall*, at 66. This difference always supports independent analysis of the state constitution. *State v. Smith*, 117 Wn.2d 263, 286, 814 P.2d 652 (1991) (Utter, J., concurring); *Gunwall*, at 62, 66. Finally, state law enforcement is a matter of local concern; national uniformity is not needed on this issue. *Cf. State v. Schaaf*, 109 Wn.2d 1, 16, 743 P.2d 240 (1987) (concluding there is no need for national uniformity regarding juvenile justice systems).

The *Gunwall* analysis therefore supports independent interpretation of our own due process clause. We should interpret that clause by using the analysis adopted in *Vaster*. In so doing we would retain a defensible and principled meaning to an interpretation of due process we have adopted as persuasive. In retaining *Vaster* as a matter of state constitutional law, we would also be following an approach well accepted in this state. Washington courts have on numerous occasions declined to follow the Supreme Court's overturning of a principle of federal constitutional law, choosing instead to retain the principle as a matter of

state constitutional law. *See State v. Jackson*, 102 Wn.2d 432, 688 P.2d 136 (1984); *State v. White*, 97 Wn.2d 92, 640 P.2d 1061 (1982); *State v. Davis, supra.*

Moreover, retaining the *Vaster* test would also be consistent with the approaches taken by other states which have addressed the applicability of state constitutional analysis in this area. For example, when *Youngblood* was remanded to the Arizona state courts for further proceedings, the Arizona appellate court rejected *Youngblood's* federal analysis, and instead applied a test similar to *Vaster's* as an independent interpretation of the Arizona State Constitution. *See State v. Youngblood*, 164 Ariz. 61, 790 P.2d 759 (Ct. App. 1989), *review granted in part, denied in part* (May 24, 1990). Arizona's due process clause is identical to Washington's. *See* Ariz. Const. art. 2, § 4. Delaware has adopted the same approach. *See Hammond v. State*, 569 A.2d 81 (Del. 1989). We should follow suit.

Finally, if nothing else, the Supreme Court's decision in *Youngblood* should be distinguished from the present case. In *Youngblood*, the court instructed the jury that "[i]f you find that the State has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." *Youngblood*, at 59-60 (Stevens, J., concurring). When such an instruction is given, but the jury still returns a guilty verdict, an appellate court has a basis for concluding that the jury considered the evidence to be so overwhelming that the lost evidence was unlikely to be exculpatory. *See Youngblood*, at 60 (Stevens, J., concurring). No such instruction was given in the present case. For this reason, we have no way of knowing whether the jury consciously rejected the permissible inference or whether instead the jury felt bound to disregard the evidence. *Youngblood* should not be applied absent a proper jury instruction.

## III

If *Vaster* is the proper test, then I would find Ortiz's due process rights were violated in this case.

*Vaster* requires us to first determine if there was a reasonable possibility that the evidence would have been exculpatory. In doing so, we examine both the probability that the deteriorated evidence itself would have been exculpatory and the weight of the other evidence against the defendant. *Vaster*, at 52-53. If the admissible evidence strongly indicates guilt, then the deteriorated evidence was not likely to have been exculpatory. *Vaster*, at 53.

Here, the trial judge concluded there was a reasonable possibility that analysis of the vaginal samples would have exculpated Ortiz if the samples had not been allowed to deteriorate. Solid evidence supported this conclusion. As to the samples themselves, a 55 to 60 percent chance existed that the testing of the vaginal samples would have revealed blood characteristics other than Ortiz's. In *Vaster*, we stated that even a 12 percent chance that testing would have yielded exculpatory results can amount to a "reasonable possibility", depending on the strength of the other evidence. *Vaster*, at 53.

The other admissible evidence in this case did not strongly support the guilty verdict. In fact, the trial judge concluded that the admissible evidence here was circumstantial and susceptible to a difference of opinion among reasonable people. The State's case involved primarily analysis of evidence left at the scene. Brief of Respondent, at 43. Each piece of this analysis was open to considerable dispute. The State analyzed hair follicles found at the scene of the crime and concluded that one hair could have been Ortiz's. A defense expert, however, looked at the same evidence and concluded that "very possibly and probably" someone *other* than Ortiz was the assailant. The State argued that footprints in the victim's blood were consistent with shoes owned by Ortiz, but the defense showed that nothing about the footprints pointed specifically to Ortiz's shoes; rather, the evidence showed only that they were made by similar shoes — which can be purchased at Kmart and possibly other places — with a similarly standard pattern of wear. The State also found

significant that the assailant left a track leading toward Ortiz's subdivision, but that subdivision contained perhaps 40 or 50 other houses, and there was no evidence where the assailant went after nearing the subdivision.

The State presented evidence that Ortiz told the police: "I didn't want to screw the old woman. She wanted to screw me." The State never showed, however, that this statement was made in reference to Fannie Slotemaker. Indeed, the circumstances surrounding the statement and Ortiz's mental condition suggest otherwise. Ortiz made this comment after he had just been arrested, not for the Slotemaker murder, but for an entirely unrelated crime. He was being arrested for allegedly trespassing on the property of a different woman living in another city. While he was being transported to the police station, and in the midst of proclaiming his innocence to the arresting officer, who was not even aware of the Slotemaker killing, Ortiz made the statement referred to above. The context of the statement therefore does not suggest that he was referring to Fannie Slotemaker.

Adding to the ambiguity of the statement is Ortiz's limited mental capacity. The record reflects that Ortiz has the communication skills of a preschool-aged child, his functioning overall is that of a preschool or elementary school-aged child, and his thinking is dominated by fantasy. He frequently confuses recent events with past events and mistakes fantasy for reality. Especially when Ortiz does not understand what is going on around him, as certainly must have been the case here, he responds with talk filled with imagination and fantasy. Given this tendency, it is difficult to say with any certainty that Ortiz's statement about sexual desires was a reference to Fannie Slotemaker, or whether instead Ortiz was talking about imagined aspects of the trespassing incident or about other real or imagined events. Therefore, the statement, like the rest of the State's circumstantial evidence, is open to differing interpretations by reasonable people.

The record thus bears out the trial judge's assessment of the relative weakness of the State's case. Because there was, at the very least, a "reasonable possibility" that the vaginal samples would have proven exculpatory, we should next weigh that possibility against the State's ability to have preserved it:

[We] must balance the consideration of "reasonableness" against the ability of the prosecution to have preserved the evidence. Further, in determining the appropriate sanction, a court should consider procedures established for preserving evidence, the nature of the lost evidence, and the circumstances surrounding its loss.

*Vaster*, at 52.

Here, the State had every ability to preserve the vaginal samples. When the samples were first taken, they were in a condition to be tested for blood types. The samples were frozen and sent to the Federal Bureau of Investigation Laboratory in Washington, D.C., by parcel post registered mail. The samples took 3 or 4 days to arrive at the laboratory, where a serologist noticed that the evidence had thawed during transit. He then refrigerated the samples, but did not dry or freeze them. Finally, 2 months after the samples were taken, laboratory personnel tried to test the samples. They found that the samples had putrefied due to bacterial growth — which occurs during warm, moist conditions — and thus could no longer be reliably tested. The more time that passes before a sample is tested, the greater the chance of contamination. Therefore, the 3 or 4 days of thawing and the 2-month delay in testing each played major roles in the deterioration of the evidence.

Although the State's agents were acting pursuant to their usual procedures during much of this time, it is difficult to understand why critical evidence would be submitted to such sloppy procedures. The evidence was not placed in dry ice for transit; it was not sent by overnight express; it was not dried out or refrozen after it had thawed; and even after all this, testing was not attempted until after 2 months had

passed. In light of these circumstances, and given the strong showing of the exculpatory value of the vaginal samples, I would hold that the proper sanction in this case is reversal.

In summary, I would apply *Vaster* as a matter of state constitutional law. Under that test, the State violated Ortiz's due process right to a fair trial. The conviction should be reversed and the charge dismissed.

DORE, C.J., and UTTER, J., concur with JOHNSON, J.

SMITH, J. (concurring in the dissent) — I join in the dissent, but am also greatly disturbed over the opinion testimony of Joel C. Hardin, the United States Border Patrol tracker, which included some strange conclusions on "nationality" identification. Defense counsel did not object, and indeed brought out much of that testimony himself. An objection, if made, arguably would have been sustained under ER 403 (exclusion of relevant evidence on grounds of prejudice, confusion or waste of time).

I do not believe the majority opinion in this case should become the authority in future cases for use of testimony of sign cutters or trackers which, either as expert opinion or as lay opinion, goes to such cosmic extremes as the testimony of the tracker in this case. He did have *personal knowledge* of the things he observed, but there was absolutely no *rational basis* for the conclusion he reached that the person he was tracking was a *young Mexican male*.

It seems apparent from the record in this case that counsel and the witness freely used words of sociological meaning without recognizing distinctions between them, such as *race, ethnicity, national origin*, and *nationality*. It seems also, although less apparent, that Mr. Hardin was able to convert his experience in tracking undocumented persons at the Mexican border into some type of divine intuition which equipped him to determine the race, ethnicity, national origin or nationality of the person he was tracking.

Under ER 702 (testimony by experts), Mr. Hardin might have qualified for expert testimony as a "sign cutter" or tracker, he having tracked over 5,000 human beings in the course of his 23-year career. The trial court, though, properly admitted his testimony as lay opinion under ER 701 (opinion testimony by lay witnesses). There was nothing strange about his testimony concerning his determination of the height and weight of the person he was tracking, based upon his extraordinary ability to observe tracks and signs. It defies reason and logic, though, that anyone — including Mr. Hardin — could determine, based solely upon "sign cutting" or tracking techniques and interpretation of the trail, that the person being tracked was "a young Mexican male." Even if the testimony is determined to be competent, such a conclusion was unduly prejudicial to Appellant Ortiz, who is a young (age 22) Hispanic (Latino) male of Mexican ancestry.

Could Mr. Hardin, the tracker, determine that he was tracking a young American male? A young Polish male? A young French male? A young German male? A young Japanese male? A young African male? Mr. Hardin in his testimony insisted that he could, relying upon his "sign cutting" or tracking skills and experience.

Defense counsel did object to one unusual statement by Mr. Hardin on direct examination ("My conclusion was that the person was going across there, spoke to the dog at that point and the dog, reassured that everything was all right . . . just turned around and meandered or started back to the house at that point."). His objection was overruled.

However, typical conclusions by Mr. Hardin, which defense counsel himself elicited on cross examination and to which he did not object, include:[8]

> Well, based on what I am seeing here, we're following somebody that's about 150 pounds, five-six, five-seven, young person. The way they cross through raspberries and travel is just like a Mexican. . . . Yeah, the sign impressed me that way, having followed hundreds of Hispanic individuals through raspberry fields, that was the sign, that's what the sign looked like to me.

---

[8]Verbatim Report of Proceedings, at 960-61.

Actually, the conclusion reached by Mr. Hardin on direct examination was an entirely appropriate response to the question asked:[9]

Q: Did you form an opinion as to the size and weight of the individual that left the sign?

A: Yes. It had to be someone who was about, who was shorter than I was and shorter than Peterson. It had to be someone who was five-seven or five-eight, in that neighborhood, relatively short, had to be slighter or lighter than I am and we figured that 140 to 160, right about 150 pounds, a person who traveled well, was used to walking and used to raspberry fields, used to being out there, was accustomed to that sort of thing. He traveled easily through the raspberries without any problem. He knew where the wires were. He knew how the raspberries were caned. He put his feet down well. He walked assuredly. He was, in my judgment, a young person, active and in good health traveling quite easily and very accustomed to being out there.

Portions of Mr. Hardin's testimony, mainly in response to questions on cross examination, will illustrate the tenuous, and perhaps dangerous, foundation for his conclusion which went to the identification of Appellant Mario Ortiz, a young Latino (Hispanic) of Mexican origin.

The tracker, Mr. Hardin, seemingly drew upon some ontological intuition as he further elaborated on his conclusion under cross examination:[10]

Q: So to sum that up, basically, it would be fair to say that Mexicans are used to walking through raspberries wherein you or I are probably not?

A: I doubt seriously that you are.

Q: And that is based on what?

A: It's based on my having been in the raspberry fields for many years and observing the people in the raspberry fields and following sign transiting through raspberry fields.

Q: So what we're really saying is that you can look at me, I don't appear to be Mexican, and so, therefore, in your opinion I would have difficulty going through a raspberry field?

A: Your sign going through a raspberry field would be significantly different than a Mexican individual who was used to being out there and working in raspberries, yeah.

---

[9]Verbatim Report of Proceedings, at 955-56.

[10]Verbatim Report of Proceedings, at 962-69.

Q: What, referring again to your testimony about the passage through the raspberry field as being very characteristic of a particular nationality, in your experience as a Border Patrol tracking person what other nationalities have you tracked, Mr. Hardin?

A: What other nationalities?

Q: Yeah. Is that the phrase that you are most comfortable with, nationality?

A: Well, you are asking, I track many people other than Mexicans. Probably all Latin and South American nationalities, I have tracked German and French, US at one time or another, probably have been involved in 20, 30 different people from different countries, tracking people from different countries.

Q: Okay. And is the way a person walks or is a person's gait determined by where they're born? Is that your testimony?

A: No, no. First of all, the person's gait, where we're actually talking about the footfall interval, is what we're talking about, and by talking about a person's gait in relation to a track, you are picking one item or one characteristic out of the totality of that track. We know a particular gait wouldn't be based on the nationality. It would be based upon the physical characteristics of that particular individual.

Q: Okay. If it's based on the particular characteristic, of the individual, then how do we, I mean, you have reached an opinion here that the individual is Mexican.

A: (No audible response by the witness. Nodding head in the affirmative).

Q: Well, what characteristic do Mexicans share in terms of, other than berry fields, in terms of the way they walk which perhaps are not shared — my last name is Komorowski — are not shared perhaps by Polish people?

A: Well, in my experience of chasing Mexicans through fields, when he ran across that plowed field there that was a person who is physically in good shape, picks his feet up, puts them down, so on, very much the same as numerous Mexican tracks that I have followed through various different areas. So that was one of the portion of the characteristics of the sign that went together to make up the totality of that judgment.

Q: And that would not be true, first of all, of Polish people?

A: It might be if a Polish person was used to that area and had worked on it and so on, so forth.

Q: Well, what sign would you expect to see through this field, for instance, if a Polish person had gone through?

A: Right now I have, I can't recall ever having followed or tracked a Polish person who was used to ever being out in that kind of an area. So I am not sure. It probably would be the same evidence or the same sign as anyone who would be unfamiliar with that area.

Q: Now in terms of getting back to this gait situation, and I realize that's a portion of how you reach your conclusion that anybody you would expect that was unfamiliar with this area would leave approximately the same sign, is that what you are saying?

A: Well, hypothetical, your hypothetical instances are hard to address. What a person totally unfamiliar with that area, what kind of sign he would leave, would vary with every individual probably.

Q: Have you had the occasion to track Europeans?

A: Oh, yes.

Q: Okay. What sign would you expect to see from a European going through that field?

A: What sign would I expect to see. To characterize ethnic European nationality from Hispanic nationality, normally you see someone is again used to walking. Their footgear is different, their mannerisms and their carrying are.

Q: Who is used to walking, which group are we talking about that is used to walking?

A: Some European nationalities. Your, you know, European nationalities.

Q: What nationality are we talking about, German, Swiss? Pick one. Canadian? How about German? Let's talk about German. Are they used to walking?

A: They could be, yes. Many of them are. It could be. If you are talking about someone who has arrived on the continent from Germany, probably their footgear is different. They're unfamiliar with the kind of area that we have depicted here in the raspberry field and the heavy distance that the tracks crossed and so now exactly how that would vary from the sign that's here, I don't know. I'm not prepared to say how that would differ. If I could see the sign on the ground, I could probably show you the differences or variances.

Q: You're saying, aren't you, Mr. Hardin, is that from this track that you characterized would be less than half a mile, you can differentiate between the race, or, excuse me, the nationality of the person who made that track?

A: No. I think we may be confusing things here. What I said was, the point that I made, the comment midway through

at some point, through the sign while we were in the raspberry fields to Sergeant Peterson, he said "What do you think?" And I was describing the totality of the circumstances. I said, "He travels like a young Mexican." That's what I said and that was based on what was apparent to me. I didn't say that the suspect was a young Mexican. I didn't say that the person who they would arrest would be a young Mexican. He asked me what I thought about the sign and that is what I stated.

Q: You did say you had an opinion as to the person that made this track in terms of nationality, isn't that what's right in front of you?

A: I said that I thought he was a young Mexican.

. . . .

Q: All right. Now there [referring to the witness' prior sworn testimony] you talk about the ability to or the necessity as an agent, do you not, to distinguish between plain old Mexicans that are coming up here to find a job or Mexicans that are carrying dope or something from Canada, the United States or European nationality. You are talking there about the ability to distinguish race based on sign.

A: It's national origin rather than race.

Q: How do you differentiate between — well, first — could you define what you mean by old Mexicans? Explain how you differentiate between plain old Mexicans from a Mexican that is carrying dope from a European who is carrying dope, so and so forth?

A: As I was using it here as plain old Mexican, they're coming up here to find a job or Mexicans that are coming up here possibly carrying dope. I haven't read the rest of this but, in general, I would, my perception is that this is in relation to determining whether or not somebody is carrying contraband into the United States or the ones who are only coming up here to find a job and work in order to feed their families in Mexico.

Q: How is that reflected in their sign, their gait?

A: Oh, you would almost have to see the sign to be able to tell. It becomes a very important part of your work habits to be able to tell what the intentions and the objectives of the people that you are following. The people who have dope are probably going to kill you if they get the chance. The ones who are coming up here to get a job and to go to work probably are not. You better know what you are doing —

Q: Right.

A: — and the sign, the sign travels different. It carries itself differently. The intentions of the person, what's in their mind, is different. Their actions that are communicated to you from the sign they leave on the ground are different,

the secreting of objects that they carry or whatever are different from a person whose only concern is being observed.

On first redirect examination of Mr. Hardin, the prosecuting attorney asked some leading questions to clarify the impressions given by Mr. Hardin in his testimony on cross examination:[11]

Q: Joel, you were asked a number of questions about determining nationality by looking at sign. Do you feel you could be able to determine the difference in sign like when Mr. Komorowski used his name, I will use my name, McEachran, which is of Scottish background, and I believe your opinion of the tracks were in this case anywhere from, I believe you said from five-six to five-eight, approximately 150 pounds, let's assume this was a person who walked, didn't drive a car, he walked all over; he also worked in raspberries, knew raspberries well, was a younger person, good physical shape. Do you believe you would be able to distinguish the sign that that person would leave, a sign that a person who had the same, approximately the same physical size, 150 pounds, between five-six and five-eight, within that height range, was a walking person and was familiar with raspberries and was of Mexican origin?

A: Probably not, unless there was some obvious or some unusual characteristic, no.

Q: The question I am asking is not whether you could differentiate those two signs, one sign from another by following these people, the question is whether or not you could tell the national origin of those people based on those characteristics that I have mentioned.

A: No.

Q: In other words, one is from Scotland or has a Scottish background or one is from Mexico, has Mexican background?

A: Not in general, unless there would be some unusual characteristic, but in general, no, you couldn't.

Q: When you were asked by Ron Peterson what you thought or what you had described, what you told him, you indicated the person was a walking person and the size, you indicated you believed it would be a young Mexican male, young Mexican person. As far as the nationality and as far as your opinion is that as clear and was that as strong in your statement to Ron Peterson as the size, the size characteristics, the fact that this person was a walking person?

---

[11]Verbatim Report of Proceedings, at 977-80.

A: No. I was describing to Ron the, more the type of sign that I was seeing, the type of sign that we were looking at, the characteristics of the sign that I was seeing. The statement that it was a young Mexican was more to describe the overall general characteristics of the sign that we were seeing rather than to denote it had to be a Mexican in deference to a German or Swiss or something of that. It kind of got this nationality all twisted in here which is not, is not pertinent to the sign cutting at all. The overall general characteristics of the sign that we were seeing was that type of a field worker used to working in raspberries, used to being out there, traveling afoot and so on. That's what I was describing to Sergeant Peterson.

Q: Did the composition of the labor force in Whatcom County that related to raspberry picking have any play or have any, become a factor in your response to him about what you were looking at?

A: Predominantly the labor force working in raspberries up there are Mexican people, not necessarily people from Mexico, but of Mexican descent, Hispanic nationality people and much the same as if you are describing some other characteristic, general characteristic of a certain type of people, perhaps a crewman. If you say a crewman, people think you are talking about people who work on ships. In fact, you might be talking about an airplane pilot but automatically you think of someone who works on a ship and in order to convey an image of general characteristic of what I was talking about, Ron said, "What do you think?" I said, well, because of this and this and this, they travel like a young Mexican. That's basically it.

Despite that line of questioning, questions on recross examination reinforced Mr. Hardin's strange conclusions on "nationality".[12]

Q: That statement, in fact, Mr. Hardin, is based on race, stereotype, wasn't it? Aren't we talking about raspberries and that is particularly, to use your terminology, how he travels through a raspberry field is "very characteristic" of a particular nationality? Aren't those your words, Mr. Hardin?

A: They could be. You are reading them. I assume that they are.

---

[12]Verbatim Report of Proceedings, at 984-85.

Q: Why don't you tell us whether or not those are your words, Mr. Hardin?

A: "[T]he method in passage of the sign through the raspberry fields and the way it traveled, held up and so on as it passed through the raspberry field was very characteristic of a particular nationality," yes.

Then on second redirect questioning by the prosecuting attorney, the following was stated:[13]

Q: Joel, in regard to that question, was that based on the racial stereotype or was that based on the experience of the sign and your experience looking at individuals who were field workers?

A: It's based on my experience as being out in the raspberry field and looking at sign and tracks and/or observing the people who are out there.

Not only did Mr. Hardin insist that he could determine whether a person he was tracking was a "young Mexican male", but he also testified that he could distinguish between "plain old Mexicans" coming here to find a job and "Mexicans . . . carrying contraband into the United States. . . ." The conclusion reached by Mr. Hardin on "nationality" of his quarry in this case is fraught with stereotypes. It begs the question to suggest that the jury could separate intelligent reasoning from psychic fantasy, particularly where the conclusion that the person being tracked was a "young Mexican male" matched the person of Appellant Ortiz.

Despite the fact that no objection was made by defense counsel who elicited the "Mexican national" testimony, its admissibility was unduly prejudicial and inconsistent with any concept of fundamental fairness in our criminal justice system.

UTTER, J., concurs with SMITH, J.

---

[13]Verbatim Report of Proceedings, at 985.