# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 59228-9-I |
| | ) | (consolidated with |
| Respondent, | ) | no. 65701-1-I) |
| | ) | |
| v. | ) | DIVISION ONE |
| | ) | |
| JOEL M. ZELLMER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: May 28, 2013 |
| | ) | |

APPELWICK, J. — Zellmer was convicted of murdering his three year old stepdaughter. He argues that the trial court improperly admitted evidence of prior bad acts, violated his right to a public trial, allowed improper expert testimony, gave an erroneous unanimity instruction, violated his right to be present for a jury inquiry, and improperly unsealed documents. He also argues the State violated his right to a confidential relationship with his attorney prior to trial and committed prosecutorial misconduct at trial. We affirm.

## FACTS

Stacey Ferguson and Joel Zellmer met and began dating in May 2003. Two weeks later, Zellmer proposed in front of his friends and Stacey said yes to avoid embarrassing him. Although she had reservations about getting married, Stacey decided to go through with the wedding after she became pregnant in July. They were married in September 2003, and Stacey and her three year old daughter, Ashley McLellan, moved into Zellmer's home. .

Stacey worked full-time as an office manager at a chiropractic clinic. Zellmer did not work. He initially told Stacey that he was a semi-retired police officer and firefighter that now did day trading. Later, Stacey learned that Zellmer was actually collecting

benefits from the Washington Department of Labor and Industries (L&I). Zellmer showed Stacey a medical book and explained the different things he needed to prove to get a full L&I pension. He told her that he had a doctor in his back pocket who would write anything Zellmer wanted him to write. Stacey did not think Zellmer had actual impairments and believed he was capable of working.

Soon after the wedding, Zellmer suggested they obtain life insurance policies on Stacey and Ashley. Stacey went along with it. They obtained a $200,000 policy on Ashley's life. They also took out policies for Zellmer's sons, Dakota and Levi.

Their relationship was tumultuous, and Stacey and Ashley moved back and forth between Stacey's parents' home and Zellmer's home. Ashley became increasingly uncomfortable around Zellmer. One time, Stacey noticed scrapes on Ashley, and Ashley reported that Zellmer had pushed her. During arguments with Stacey, Zellmer threatened that he knew how to use the legal system to obtain custody of their unborn child. When Stacey threatened to report Zellmer's L&I fraud, Zellmer told her, "you never mess with a man's money."

On December 3, 2003, Stacey went to work and left Ashley at home in Zellmer's care because Ashley had a high temperature and could not go to daycare. That evening, Dakota called 911 and reported a drowning involving a three year old victim. Emergency responders arrived at Zellmer's residence and found Zellmer kneeling over Ashley's body. Zellmer claimed he discovered Ashley floating at the deep end of the pool, lifted her out, and carried her to the living room. He indicated that Ashley must have gone outside to eat a cake that was left on the back porch, gone down to the pool

2

to wash her hands so she would not get in trouble, and had accidentally fallen in. A cake box was on the back porch, directly outside the back door. The pool is approximately 20 yards from the back door, down two flights of stairs, and at the end of a concrete path. On that night, the deck was slippery, the temperature was in the 30s, and it was so dark that police officers needed a flashlight to see. Medical personnel were unable to get any self-sustaining response from Ashley. She died in the hospital on December 5, 2003.

The State charged Zellmer with murder in the first degree, murder in the second degree, and theft in the first degree in June 2007. By amended information, the State added two more counts of first-degree theft.[1] The theft charges were severed from the murder charges.

At trial, the State presented evidence of three incidents in which other young children were injured or suffered accidents while in Zellmer's care. The State introduced this evidence to argue that Zellmer had an overarching plan to marry single mothers, take out life insurance on their young children, then injure those children in seemingly accidental ways to collect insurance proceeds.

The first incident involved four month old Mitchell Komendant. Shortly after Zellmer and Stacey Komendant were married in 1990, Zellmer added uninsured motorist coverage to their car insurance policy. Not long after, Zellmer encouraged Komendant to take Mitchell to the emergency room, because he seemed unusually

---

[1] The theft charges alleged that Zellmer obtained control over (1) property belonging to the State of Washington, (2) mortgage loan funds belonging to Ownit Mortgage Company, and (3) insurance damage claim payments belonging to Allstate Insurance Company.

3

fussy. Zellmer told emergency room staff that his car was rear-ended in a hit and run the day before, and Mitchell had moved a little sideways in his car seat. The doctor took x-rays, but found nothing. The next day, Zellmer filed an accident report. Komendant saw Zellmer deliberately scratch the back of her car to make it seem like it had been rear-ended. He admitted to Komendant that there was no accident, but he wanted to make sure Mitchell's medical bills were covered, even though the doctor had found nothing wrong at that point.

When Mitchell did not get better, Zellmer and Komendant took him back to the doctor, who found fractures in both of Mitchell's legs. Zellmer gave a new story that a briefcase fell from the back window onto Mitchell's legs during the purported accident. Zellmer then attempted to recover the full $25,000 allowable under their insurance, even though Mitchell's hospital bills did not amount to that much.

The second incident involved Kyle Clauson, who was less than a year old and still in the crawling stage of his development at the time. In 2000, about a month into Zellmer's relationship with Kelley Clauson, Zellmer was watching Kyle in his bedroom while Clauson fixed dinner. Dakota called out to Clauson that Zellmer needed to see her right away. She found Kyle on the floor of Zellmer's bedroom dripping wet with a bluish pallor, and Zellmer standing over him, watching. For several minutes, Zellmer would not let Clauson pick Kyle up. She finally did and slapped Kyle on the back to make him cough up water. Zellmer told Clauson that Kyle had somehow crawled out of the room and gotten into the hot tub outside and Zellmer rescued him. There was a

thick, heavy cover on the hot tub. Clauson thought it unlikely that Kyle would have been able to crawl up the hot tub stairs and push the cover off.

The final incident involved four year old Madison Barnett. Zellmer and Madison's mother, Michelle Barnett, knew each other only a short time before Zellmer proposed. Shortly after they were engaged, Zellmer suggested getting life insurance. Barnett laughed and responded, "What are you going to do, bump me off?" Zellmer got very defensive and did not bring up the subject again. In December 2002, a year before Ashley's drowning, Zellmer offered to take care of Madison while her mother was busy. When Barnett came home, she found Madison withdrawn, her head down, and in a different set of clothes. Zellmer prodded Madison to tell her mother what happened. Madison explained that she fell into Zellmer's pool and that Zellmer rescued Madison, pulling her out of the pool by her hair. Barnett's and Zellmer's relationship ended shortly thereafter.

The State also presented evidence that Zellmer changed his story about what happened the night of Ashley's drowning several times. Zellmer initially reported that he put on a video tape downstairs for Ashley to watch then went upstairs to take a nap. After Dakota woke him up, he went looking for Ashley, found a cake box on the back deck that had been opened, and discovered Ashley in the pool. But, in 2004, he told four different acquaintances four different stories about what he was doing when Ashley drowned.

In the spring, he told a childhood acquaintance that he was at home with Ashley and his son Levi, waiting for Dakota to get home. He fell asleep, and when he woke up

he couldn't find Ashley in the house. He eventually discovered that she had fallen into the pool.

In the summer, Zellmer dated Levi's former history teacher. Zellmer told her that on the night of Ashley's death, he instructed Ashley to go to her room to watch a video. Meanwhile, he went downstairs to build a fire. While he was building the fire, Dakota informed him that the door to the backyard was open. He went into the backyard and discovered Ashley in the pool. Zellmer repeated that approximate version of events in sworn declarations he signed in August 2004 and January 2005.

Zellmer also renewed a friendship with a high school friend after they discovered their children played baseball together. When the topic of Ashley's death came up, Zellmer said that he was downstairs doing laundry. He went upstairs to find her and discovered that she was in the pool.

At some point in 2004, Zellmer began dating a young bank teller, who had a one and a half year old child. During the course of their short-lived relationship, Zellmer suggested that they get married and that she get life insurance for her child. Regarding Ashley's death, Zellmer told her that he had been outside chopping wood, and his two sons were inside watching Ashley. He said that Ashley went into the backyard and fell into the pool.

Each of Zellmer's versions of events, in which Ashley went to the pool on her own, conflicted with extensive testimony about Ashley's disposition. Ashley was afraid of the dark and refused to voluntarily enter dark rooms. She disliked the cold. She

could not swim, disliked bodies of water, and did not have any interest in going to the pool. She clung to caregivers and never wandered off on her own.

The jury found Zellmer guilty of second degree murder, with an aggravating factor due to Ashley's particular vulnerability. It did not reach a verdict as to first degree murder.

## DISCUSSION

On appeal, Zellmer argues that reversal is warranted by a number of trial court errors and improper acts by the State, both before and during trial. First, Zellmer argues that during the course of investigation and prosecution, the State knowingly violated his constitutional right to a confidential relationship with his attorney. Second, he claims that the trial court erred in admitting three prior incidents in which children were harmed while in Zellmer's care as evidence of a common plan or scheme under ER 404(b). Third, Zellmer contends that the trial court violated his right to a public trial by excluding the teenage son of a witness from the courtroom during trial. Fourth, Zellmer argues that the trial court erred in allowing an expert tracker to opine that Ashley did not walk across the back deck based on his analysis of crime scene photographs. He also argues that a second tracker's testimony about the opinion of a third nontestifying tracker violated his right to confront witnesses against him. Fifth, Zellmer argues the State committed prosecutorial misconduct by appealing to the jury's sympathy for Ashley's family during closing argument. Sixth, he claims that the trial court gave an erroneous unanimity instruction to the jury. Seventh, Zellmer asserts that the court violated his constitutional right to be present by answering a question from the

7

deliberating jury in Zellmer's absence. Eighth, he contends that cumulative error warrants reversal of his conviction. And lastly, he argues that the trial court improperly unsealed documents involving his requests for expert funding and claims that his attorney-client privilege was violated.

I.    Right to Counsel

Zellmer argues that during the course of investigation and prosecution, the State knowingly and sometimes deliberately violated his constitutional right to a confidential relationship with his counsel. Zellmer contends that the State intruded into his attorney-client relationship in two ways. First, he argues that the State used a jailhouse informant, Kevin Olsen, to gather information about Zellmer regarding his trial preparation and strategy. Second, he argues that the State used search warrants and subpoena authority to seize documents that contained privileged attorney-client communications. Zellmer contends that the State gained intangible benefits from these alleged violations. As such, he argues, prejudice must be presumed and the only effective remedy is dismissal.[2]

Zellmer moved to dismiss his charges because the State seized privileged documents from his home. A trial court's denial of a motion to dismiss is reviewed for abuse of discretion. State v. Hanna, 123 Wn.2d 704, 715, 871 P.2d 135 (1994); State v. Granacki, 90 Wn. App. 598, 602 n.3, 959 P.2d 667 (1998). A trial court abuses its

---

[2] Zellmer was also permitted to make a supplemental assignment of error that the trial court erred in not holding an evidentiary hearing or reviewing sealed documents to determine the extent of the violation of his attorney-client privilege. But, Zellmer makes no other argument and cites no authority for this supplemental assignment of error, so we need not consider it. RAP 10.3(a)(6).

discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007).

Zellmer also filed a motion to exclude Olsen's testimony, but did not move to dismiss based upon Olsen's involvement or testimony. As a result, the trial court did not have an opportunity to consider whether dismissal was the appropriate remedy on the jailhouse informant issue. See Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 671 n.2, 230 P.3d 583 (2010). Therefore, Zellmer has waived the issue absent manifest constitutional error. RAP 2.5(a)(3). An error raised for the first time on appeal must be manifest and truly of constitutional dimension. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). The defendant must show how the alleged error actually affected his rights at trial. Id. at 926-27.

A defendant's right to effective counsel is protected by the Sixth Amendment of the federal constitution and article I, section 22 of the state constitution. Intrusion into private attorney-client communications violates a defendant's right to effective representation and due process. State v. Cory, 62 Wn.2d 371, 374-75, 382 P.2d 1019 (1963).

A. Deliberate, Egregious Intrusion

Two themes arise in Washington cases addressing this issue. First, dismissal is warranted when the State's intrusion into the defendant's attorney-client communications is both deliberate and egregious. Second, the State's intrusion is deliberate and egregious when the intercepted communications are those between the

defendant and his counsel in the case being tried. For instance, in Cory, the defendant met with his attorney to discuss his case in a private jail room, where a sheriff's deputy had secretly installed a microphone to eavesdrop on their conversations. Id. at 372. The Washington Supreme Court concluded that dismissal was the only appropriate remedy, because it was impossible to isolate the resulting prejudice. Id. at 377-78. The officer's "shocking and unpardonable" conduct deprived Cory of his right to effective counsel, vitiating the entire proceeding. Id. at 378.

In Granacki, during trial recess, a detective read defense counsel's trial notes and engaged in a discussion with a sitting juror. 90 Wn. App. at 600. The trial court declared a mistrial. Id. at 601. After briefing, the trial court concluded the detective had intentionally read counsel's notes and that dismissal based on that conduct was warranted. Id. This court acknowledged that the intrusion into Granacki's right to counsel was less egregious than the eavesdropping in Cory, but was nonetheless analogous, so it was within the trial court's discretion to dismiss. Id. at 603-04. Both the Cory and Granacki courts found dismissal appropriate to discourage such deliberate and egregious intrusions into the defendant's attorney-client privilege. Id.

In Garza, prison guards seized inmates' personal property, including legal documents containing private communications with their attorneys. State v. Garza, 99 Wn. App. 291, 293, 994 P.2d 868 (2000). When the materials were returned to the inmates, it was clear they had been examined and possibly even read. Id. at 296. The appellate court concluded that the State intruded upon the defendants' private

relationships with their attorneys. Id. The court remanded for additional fact-finding to determine if the jail's security concerns justified the purposeful intrusion. Id. at 301.

In Perrow, detectives seized documents pursuant to a search warrant that included notes the defendant wrote in preparation for meeting with his attorney about the allegations against him. State v. Perrow, 156 Wn. App. 322, 326, 231 P.3d 853 (2010). The defendant informed the detectives that they had seized privileged materials. Id. Nevertheless, one detective then read through the privileged documents page by page and prepared a written analysis of them and forwarded it to the prosecutor's office. Id. The appellate court concluded that the trial court did not abuse its discretion in dismissing the defendant's charges, because it was impossible to isolate any resulting prejudice.[3] Id. at 332.

B. Appropriate Remedy

When the State intrudes into the defendant's attorney-client relationship, the question remains what is the appropriate remedy. Zellmer argues that the State's intrusion is a structural error, requiring a presumption of prejudice and automatic dismissal. This contention is not supported by controlling case law. Since Cory, the United States Supreme Court rejected a per se rule that any government intrusion into private attorney-client communications establishes a Sixth Amendment violation of the

---

[3] Zellmer also relies extensively on the Connecticut case State v. Lenarz, 301 Conn. 417, 22 A.3d 536 (2011). There, the facts were very similar to Perrow. The State seized voluminous materials from the defendant's home. Lenarz, 301 Conn. at 420. After defense counsel informed the State that certain materials were privileged, the court ordered that any such items remain unpublished and unread. Id. But, the state laboratory analyzing the seized documents discovered detailed discussions of the defendant's trial strategy, that it forwarded to the police, who in turn forwarded the materials to the prosecutor. Id. at 421.

defendant's right to counsel. <u>Weatherford v. Bursey</u>, 429 U.S. 545, 552, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). Rather, constitutional validity depends on whether the improperly obtained information has "produced, directly or indirectly, any of the evidence offered at trial." <u>Id.</u> In <u>Weatherford</u>, an undercover agent sat in on a meeting with his co-conspirators and their attorneys to maintain his undercover identity. <u>Id.</u> at 547-48. The Court held that there was no violation of the conspirators' Sixth Amendment right to counsel, because the agent did not communicate any defense strategy to the prosecution and there was no purposeful intrusion. <u>Id.</u> at 558.

This is further supported in Washington cases. In <u>Granacki</u>, we noted that governmental misconduct generally does not require dismissal absent actual prejudice to the defendant. 90 Wn. App. at 604. Even then, the trial court may properly choose to impose a lesser sanction, because this is a classic example of trial court discretion. <u>Id.</u> In that case, had the trial court chosen to ban the detective from the courtroom, exclude his testimony, and prohibit him from discussing the case with anyone, we would not have found an abuse of discretion. <u>Id.</u> Similarly, the <u>Garza</u> court recognized that dismissal is not required where prejudice is contained by suppressing the evidence or ordering a new trial. 99 Wn. App. at 300. The <u>Garza</u> court held that if the trial court found on remand that the jail officers' actions violated the defendants' right to counsel, it had discretion to fashion the appropriate remedy. <u>Id.</u> at 301-02. The court noted that dismissal is an extraordinary remedy, appropriate only when less severe sanctions will be ineffective. <u>Id.</u>

Weatherford, Granacki, and Garza soundly rebut Zellmer's claim that such violations are structural errors requiring automatic reversal. Indeed, structural errors are rare and Washington courts are exceedingly hesitant to classify errors as such. State v. Paumier, 176 Wn.2d 29, 46, 288 P.3d 1126 (2012); see also In re Pers. Restraint of Benn, 134 Wn.2d 868, 921, 252 P.2d 116 (1998) (rejecting argument that violation of the right to be present is a structural error). Examples of structural error include complete deprivation of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, and denial of the right to self-representation. Paumier, 176 Wn.2d at 46; see, e.g., United States v. Gonzalez-Lopez, 548 U.S. 140, 146, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). Given this strong presumption against structural errors, we decline to find one where no case law supports doing so.

## C. Jailhouse Informant

Zellmer moved to exclude Olsen's testimony, arguing in part that the State used Olsen to deliberately elicit information about the charged crime, violating his Sixth Amendment right to counsel under Massiah v. United States, 377 U.S. 201, 205-06, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). The trial court held an extensive pretrial hearing on the motion and considered the following facts. Olsen was a long-time jailhouse snitch. In November 2007, he contacted Detective Mike Ciesynski to volunteer information about four different cases, including Zellmer's. Both Ciesynski and Olsen then contacted Detective Sue Peters, who was investigating Zellmer's case. But, there was no evidence that Ciesynski encouraged Olsen to eavesdrop on Zellmer or offered any benefit to Olsen for the information on Zellmer. Peters acknowledged to Olsen that

Zellmer was a thorn in her side, but instructed Olsen not to solicit any other information from Zellmer. However, Peters met with Olsen in December 2008, and Olsen called her a number of times afterward. Detectives and prosecutors spoke with Olsen several more times to take recorded statements about his conversations with Zellmer. They also did not separate Zellmer and Olsen, who were in the same tank together in jail.

The court found that the State did not deliberately solicit any disclosures from Olsen. As such, the court found that the detectives and prosecutors did not engage in any misconduct. But, the court explained that after Olsen's initial disclosure, the State realized it "had an ear into the defense" and kept listening, when it should have stopped and separated Zellmer and Olsen. As a result, the court categorically excluded all evidence of subsequent disclosures Olsen made to the State after his initial contact with Detective Ciesynski. This remedy is similar to the one acknowledged in Granacki as legitimately within the court's discretion.

Nevertheless, Zellmer contends that the State's "'ear into the defense'" was useful in shaping its trial strategy. For instance, Olsen told detectives that Zellmer said his anger got the best of him when he drowned Ashley. The State acknowledged that this was the first and only time Zellmer admitted that Ashley did not get into the pool on her own. But, the State argued at trial that Zellmer's murder of Ashley was premeditated based on his overarching plan to claim her life insurance proceeds—not that his anger got the best of him. Other than baldly asserting that Olsen's information shaped trial strategy, Zellmer makes no showing that Olsen's disclosures led to discovery of other evidence or altered the State's trial strategy. Rather, the trial court

14

effectively isolated any potential prejudice by excluding the evidence, without resorting to the drastic remedy of dismissal.

Moreover, in Cory, Granacki, Grath, and Perrow, a *government agent* intruded into the defendant's attorney-client relationship. Zellmer's case is distinguishable, because the trial court found that Olsen was not acting as a government agent. Zellmer does not challenge that finding. See State v. Hunter, 100 Wn. App. 198, 204, 997 P.2d 393 (2000). No government official asked Olsen to serve as an informant in Zellmer's case and there was no agreement that he would do so. In fact, detectives told Olsen not to spy on or engage with Zellmer, because it was illegal. The trial court explained:

> There's nothing in this record to indicate that Detective Ciesynski or anybody else put Mr. Olsen with Mr. Zellmer, was looking for Mr. Olsen to gather any information from Mr. Zellmer, provided any explicit, implicit offer of benefit to Mr. Olsen for providing information about Mr. Zellmer, or otherwise engaged in improper behavior with regard to Mr. Olsen and Mr. Zellmer.

The trial court even chastised defense counsel for making such accusations without a shred of evidentiary support. Because Olsen was not a government agent, there can be no government misconduct as a matter of law.[4] See Benn, 134 Wn.2d at 912; Hunter, 100 Wn. App. at 205. In Hunter, we found similar fact—that no government officer directed informant toward defendant or asked him to gather information on the

---

[4] Though Zellmer does not challenge Olsen's agency, it is worth nothing that courts have declined to find agency when "'there was no evidence that the government had directed or steered the informant toward the defendant.'" Benn, 134 Wn.2d at 912 (quoting United States v. York, 933 F.2d 1343, 1356 (7th Cir. 1991)). Courts have likewise declined to find agency "even when the informant and the defendant were placed in the same cell, because there was no prior agreement between the government and the informant." Id.

defendant, and there was no agreement that he would do so—dispositive in affirming the trial court's denial of the defendant's motion to dismiss. 100 Wn. App. at 202, 205.

The trial court acted within its discretion by excluding all evidence of Olsen's conversations with the State about Zellmer. Exclusion isolated any potential prejudice. We find no constitutional violation and no basis to dismiss on these grounds.

D. Seized Documents and Insurance Files

In December 2005, the State obtained a search warrant for Zellmer's residence. Police officers executed the warrant and obtained large volumes of documents from the home. At the time of the search, the officers knew Zellmer was involved in judicial proceedings. In addition to divorce and custody disputes, Stacey had sued Zellmer for wrongful death. Accordingly, the officers at the scene took precautions to scan and segregate privileged documents. They did not review any arguably privileged documents. After the seizure, Zellmer's attorney advised the prosecution that the State had seized privileged materials.[5] The State permitted Zellmer's attorney to look through seized items and identify those that were either privileged or beyond the scope of the warrant. The court then appointed a special master to review items that Zellmer's

---

[5] In August 2006, Zellmer filed a motion for the return of property. He argued that there was no probable cause to support the search warrant, that the warrant lacked sufficient particularity, and that the seizures exceeded the scope of the warrant. At that time, no criminal charges had been filed against Zellmer. The trial court largely denied the motion. Zellmer filed a notice of appeal from that decision and submitted his first brief on May 14, 2007. When Zellmer appealed following his murder conviction, the two appeals were consolidated for review. The remedy when evidence is improperly seized, however, is exclusion. See, e.g., State v. Riley, 121 Wn.2d 22, 30, 846 P.2d 1365 (1993). Here, the State used at trial only one piece of evidence that was seized during the search. The existence and substance of that evidence was independently established by Stacey. Thus, there is no additional remedy available for the issues raised in Zellmer's first appeal, and we do not evaluate those arguments.

16

attorney alleged contained privileged materials. The investigators never looked at the challenged documents again.

Detectives discovered and read one brief document on Zellmer's computer called "accident.doc" that explained the drowning incident. They noted that the version of events in the document was different than other statements by Zellmer. But, the document did not appear privileged on its face and did not contain any language that suggested it was written for a lawyer. Even so, the document was later deemed privileged and excluded.

This search and seizure is quite distinguishable from the purposeful intrusion in Perrow where the detective knew documents were privileged when he analyzed them and sent them on to the prosecutor's office. 156 Wn. App. at 326. Instead, detectives here took measures to isolate and avoid reviewing privileged materials. And, there is no evidence that they communicated the content of privileged documents to the prosecutor's office. Detectives did nothing analogous to eavesdropping on Zellmer's conversations with his attorney, reading defense counsel's trial notes, or searching Zellmer's jail cell to discover confidential communications. Any State intrusion into Zellmer's attorney-client privilege during the search and seizure of documents from Zellmer's home was neither deliberate nor egregious.

Moreover, none of the information seized from Zellmer's home concerned his relationship with his defense counsel, except the computer document that did not appear privileged on its face and was excluded at trial. Rather, the allegedly privileged documents were communications with attorneys related to prior divorces, custody

17

disputes, and the wrongful death lawsuit. The trial court reasoned that having relationships with attorneys, and having those documents in his home, did not shield Zellmer from an otherwise lawful search. To automatically dismiss a case on such grounds would be absurd, because if a defendant had any prior relationship with an attorney, he could claim governmental intrusion into his attorney-client privilege in those other matters. Such a rule would hinder effective law enforcement and lead to unnecessary dismissals.[6]

The State also obtained an insurance file from Zellmer's homeowner insurance carrier that concerned whether the insurer had an obligation to represent Zellmer in the wrongful death case. Zellmer told his insurance company a different version of events than he was alleging in the criminal case. The State believed the file had high evidentiary value and disputed Zellmer's position that the file was privileged. The court concluded that the file, which apparently was not taken from Zellmer's home, was not obtained directly or indirectly by government intrusion. And, the file did not enhance the State's strategy, because Zellmer had already made admissible inconsistent statements about what happened the night of Ashley's drowning.

The trial court effectively isolated any potential prejudice from the challenged documents. Exercising an abundance of caution, the court deemed all disputed materials privileged and excluded them from trial, including the insurance file. And, the court concluded that the State did not gain any benefit from seeing the brief

___

[6] Indeed, the dissent in Perrow explained that a "shrewd defense attorney, in either a civil or criminal case, would be wise to 'inadvertently' send a privileged document to the plaintiff's counsel and then seek dismissal of the pending civil or criminal case." 156 Wn. App at 340 (Korsmo, A.C.J., dissenting).

"accident.doc" or the insurance file, because the State already had other evidence of Zellmer's inconsistent version of events. This is the proper analysis under Weatherford. Simply because the State saw potentially privileged materials does not require a presumption of prejudice and dismissal. See State v. Webbe, 122 Wn. App. 683, 697, 94 P.3d 994 (2004) (refusing to presume prejudice where prosecutors saw privileged notes from defense counsel's meeting with defendant, which included a discussion of the pending charges). Moreover, the court found that the State made an affirmative showing of lack of prejudice to Zellmer. Therefore, the court acted well within its discretion by excluding any allegedly privileged material from trial, but denying dismissal of the case because Zellmer showed no prejudice.

II.    ER 404(b) Evidence

After an extensive pretrial hearing, the trial court allowed the State to introduce evidence of three prior incidents in which children were harmed while in Zellmer's care. The court admitted the incidents under ER 404(b) as evidence of Zellmer's overarching plan to orchestrate a child's death in order to collect insurance proceeds. Zellmer argues that the trial court erred in admitting this evidence, because the incidents were accidents and therefore could not be part of a purposeful plan. Zellmer also contends that the incidents were not markedly similar to one another and to Ashley's drowning.

We review a trial court's decision to admit evidence under ER 404(b) for abuse of discretion. State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Contrary to Zellmer's argument, ER 404 errors are not of constitutional magnitude. State v. Jackson, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). To be admitted under ER 404(b),

19

prior acts must be (1) proved by a preponderance of the evidence, (2) admitted for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial. State v. Lough, 125 Wn.2d 847, 852, 854, 889 P.2d 487 (1995).

Prior and current acts need not be *identical* to be admissible as common plan or scheme evidence. DeVincentis, 150 Wn.2d at 21. Rather, there need only be a substantial similarity between the prior bad acts and the charged crime. Id. Substantial similarity is shown when the acts demonstrate such a concurrence of common features that they may naturally be explained as individual manifestations of a general plan. Id. This includes markedly similar acts of misconduct against similar victims under similar circumstances. Lough, 125 Wn.2d at 855-56. Uncompleted manifestations of an overarching plan may also be admissible. State v. Roth, 75 Wn. App. 808, 822 n.8, 881 P.2d 268 (1994).

A. Mitchell Komendant

The first incident admitted involved four month old Mitchell Komendant, whose legs were suspiciously fractured while in Zellmer's care. Zellmer added uninsured motorist coverage to the couple's automobile insurance shortly after he and Stacey Komendant were married in 1990. Zellmer then claimed Mitchell was injured in a car accident, filed an accident report, and attempted to collect from the insurer. But, he later admitted to Mitchell's mother that there was no accident. The State argued this was the beginning of Zellmer's overarching plan to marry single mothers and injure their young children in order to profit from insurance claims.

Zellmer claims that there is no evidence as to what caused Mitchell's injuries. And, he argues that the incident is not markedly similar to the other incidents, because the financial motive to collect insurance only arose after Mitchell was injured. These arguments are not supported by the record. The court found by a preponderance of the evidence that Zellmer was clearly the agent of Mitchell's injuries. This is readily apparent, because the injury occurred while the child was in Zellmer's care and he fabricated the accident. And, the incident is markedly similar to Ashley's drowning, because Zellmer married a single mother with a young child, orchestrated an injury to his step-child left in his care, then attempted to collect insurance proceeds from the injury.

The court concluded that the common plan or scheme was "a fairly obvious one here of fabricating injury to property, to Mr. Zellmer himself, and to very young children who were not biologically Mr. Zellmer's, only legally his." The court found that the evidence was relevant as one of the incidents in Zellmer's overarching plan, "extremely relevant" to the State's claim of premeditation, and relevant to show Zellmer's knowledge of how to make insurance claims. The court acknowledged that the evidence was prejudicial, but not unfairly so within the meaning of ER 404(b). The trial court did not abuse its discretion in admitting this evidence.

## B. Kyle Clauson

The second incident admitted involved Kyle Clauson, who was less than a year old and still in the crawling stage of his development when he nearly drowned in a hot tub while in Zellmer's care. The child would have had to climb several steps to enter the

hot tub, and the hot tub was normally covered by a heavy lid. The State argued that this incident was an uncompleted manifestation of Zellmer's plan to murder a child by making it appear that the child accidentally fell into a body of water. The State maintained that Zellmer used this incident to test how a single mother would react and to see if she accepted his explanation.

Zellmer argues that the court found no evidence that he intentionally injured Kyle. This argument is unsupported by the record. The court stated that it admitted the evidence in part for the purpose of showing lack of accident. The facts of the incident support that decision. Zellmer also argues that this event is distinguishable from Ashley's drowning, because he had no potential insurance gain and there was no actual injury to Kyle. It is true that Zellmer and Clauson were not married and that Zellmer did not have a life insurance policy taken out on Kyle. But, other aspects of the incident are strikingly similar to Ashley's death. Zellmer was left alone with a single mother's young child and the child somehow fell in a body of water, even though the child's developmental characteristics made it highly unlikely that he would have crawled into the hot tub by himself. Zellmer then had the opportunity to gauge the mother's reaction to his explanation that it was an accident. Characterization of the incident as an uncompleted manifestation of Zellmer's alleged overarching scheme is not inconsistent with our case law. And, as such, uncompleted or individual manifestations of an overarching plan may be admitted as ER 404(b) evidence. DeVincentis, 150 Wn.2d at 19-21; Roth, 75 Wn. App. at 822 n.8.

The court acknowledged that the evidence was prejudicial. But, the court found that this evidence had "extreme probative value," because it was good evidence of Zellmer's overarching plan or preparation to move quickly into a relationship with a single mother, injure her young child in what appeared to be an accidental way, then "see if he was essentially able to sell it." On balance, the probative value of this evidence outweighed the resulting prejudice. The trial court did not abuse its discretion in admitting this evidence.

## C. Madison Barnett

The third incident admitted involved four year old Madison Barnett, who fell in Zellmer's pool in December 2002, a year before Ashley's drowning. Zellmer proposed to a single mother with a young daughter after a brief whirlwind romance. Zellmer soon broached the subject of life insurance with her. Then, Zellmer seized the opportunity to gauge her response to her daughter accidentally falling in Zellmer's pool. This fits within Zellmer's larger scheme of testing mothers' responses to their children accidentally falling in bodies of water. The court also thought it "interesting that Mr. Zellmer and the child are out in December near the pool considering the overarching scheme and plan the State says reached its fruition with Ashley's murder."

The court found that this incident was an accident, because Madison admitted she was reaching for goggles that were in the pool and fell in. As a result, the court did not consider the incident to be "all that prejudicial, because nobody's arguing that it wasn't an accident." But, the court believed the evidence was probative and admissible, because it had many of the same features as Ashley's drowning. And, the court

23

properly limited both the prejudice and probative value by not allowing the State to argue that this evidence showed lack of accident. The court did not abuse its discretion in admitting this evidence as an uncompleted manifestation of Zellmer's overarching plan.

III.    Exclusion of a Spectator from Trial

Zellmer argues that the trial court violated his right to a public trial and the public's right to access court proceedings by excluding the fifteen year old son of a witness from the courtroom during trial.    The United States and Washington Constitutions guarantee a defendant's right to a public trial.  U.S. CONST. amend. VI; CONST. art. I, § 22.  And, justice in all cases must be administered openly, granting the public an interest in open, accessible proceedings.  CONST. art. I, § 10; Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 36, 640 P.2d 716 (1982).  To determine whether a courtroom closure is appropriate, courts must consider five factors and enter specific findings on the record to justify the closure.  State v. Lormor, 172 Wn.2d 85, 91 n.1, 257 P.3d 624 (2011).

The Washington Supreme Court recently held in Lormor that exclusion of one person does not constitute a courtroom closure and therefore does not implicate the defendant's public trial right.  Id. at 87.  Rather, a closure occurs when the courtroom is completely and purposefully closed to spectators so no one may enter or leave.  Id. at 93.  Consequently, a trial court's decision to exclude one spectator is a matter of courtroom operations, reviewed for abuse of discretion.  Id. at 94.  The Lormor court likened this broad discretion to the trial court's power under ER 615 to exclude

24

witnesses so they cannot hear testimony of other witnesses. Id. at 94. But, the trial court must still exercise caution in removing a spectator and articulate its reasons for doing so on the record. Id. However, Zellmer is incorrect that exclusion of one spectator requires the five factor analysis and specific findings for a true courtroom closure. See id. at 94-95.

Here, the trial court excluded a teenager whose father, Joe Wickersham, was scheduled to testify later that day. Zellmer argues that the teenager was excluded because he was a minor. But, he mischaracterizes the record. Before the court knew the boy was a witness's son, it said, "It's fine. It's fine to have an escorted child here. It's Dad's decision whether to bring a child to this case. I wouldn't, but it's his call." But, the court had already excluded witnesses from the courtroom under ER 615, including Wickersham, the boy's father. The court excluded the teenager specifically because it was "not confident" that he would not repeat to his father what was going on in court, which would interfere with the ER 615 order.

It was well within the trial court's discretion to exclude the boy to protect its ER 615 ruling and prevent him from passing information on to his father. This helped preserve the integrity of court proceedings and was sufficient to support the boy's exclusion. And, the court properly articulated its reason for removal on the record, as required by Lormor. There is no evidence that the court excluded the boy because he was a minor, so we need not consider whether that would be within the court's discretion. There is no error.

IV. Expert Tracker Testimony

Zellmer argues that the trial court improperly admitted expert testimony from two different trackers.

A. Testimony About Crime Scene Photographs

Zellmer argues that expert tracker Joel Hardin should not have been allowed to testify about his analysis of crime scene photographs taken by police investigators on the night of Ashley's drowning. Zellmer contends that Hardin's experience is with live, in-person tracking, not analyzing photographs. Zellmer therefore argues that Hardin's testimony was not based on reliable science, exceeded Hardin's expertise, and was not helpful to the jury.

At trial, Zellmer objected to Hardin's opinion that Ashley did not walk across the back deck and moved for a mistrial, which the trial court denied. We review both a trial court's decision to admit expert testimony and to deny a motion for a mistrial for abuse of discretion. State v. Ortiz, 119 Wn.2d 294, 308, 831 P.2d 1060 (1992); State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989). Expert testimony will be admitted when (1) the witness qualifies as an expert, (2) the opinion is based on a theory generally accepted in the relevant scientific community, and (3) the testimony is helpful to the trier of fact. State v. Cheatam, 150 Wn.2d 626, 645, 81 P.3d 830 (2003).

We have previously rejected the same argument Zellmer makes here involving the same tracker who testified at Zellmer's trial. State v. Groth, 163 Wn. App. 548, 563, 261 P.3d 183 (2011). In Groth, Hardin analyzed decades old crime scene photographs to determine whether any evidence showed that Groth's Vibram brand shoes were at

the scene. Id. at 555-56. Hardin testified that there were two sets of footprints in the photographs—one matching the victim's shoes and the other matching Groth's shoes. Id. at 556. We concluded that Hardin's training and experience allowed him to formulate conclusions solely from the photographs. Id. at 563-64.

The facts and circumstances of Zellmer's case are almost identical to Groth.[7] Investigators gave Hardin Ashley's shoes and photographs from the scene years after the drowning. They asked Hardin to determine if there was any evidence that Ashley stepped in cake frosting then walked across the deck and down the stairs to the pool. Hardin testified that he found remnants of cake frosting in the sole of Ashley's shoe. But, he found no evidence of frosting tracked from Ashley's shoe on the deck or down the stairs.

Examining photographs for evidence of Ashley's shoeprints is well within Hardin's expertise. Hardin has 40 years of experience examining footprint evidence. The Washington Supreme Court recognizes his tracking expertise. Ortiz, 119 Wn.2d at 310 (holding that Hardin was qualified as expert based on his extensive training and thousands of hours of experience). And, Hardin's testimony was helpful to the jury, because his can recognize and interpret signs that a lay person would overlook. Groth, 163 Wn. App. at 564.

Lastly, Hardin's analysis of photographs does not preclude his testimony. Id. at 563-64. Rather, it goes to the weight the jury gives it. Ortiz, 119 Wn.2d at 311. Just

---

[7] The only difference appears to be that in Groth, Hardin analyzed whether the sole matched specific footprints, while in Zellmer's case, he analyzed whether any footprints could be identified as originating from the sole.

like in Groth, Hardin was subjected to searching cross-examination. Defense counsel pointed out the shortcomings of Hardin analyzing photographs, as opposed to real-time tracking. A defense expert contradicted Hardin's conclusions. Tracking is not so technical a discipline that the jurors could not draw independent conclusions about the reliability of Hardin's testimony. Ortiz, 119 Wn.2d at 311. The trial court did not abuse its discretion in admitting Hardin's expert testimony or denying Zellmer's subsequent motion for a mistrial on that basis.

B. Confrontation Clause

Zellmer argues that a second tracker's testimony violated his right to confront witnesses against him. Kathleen Decker testified as an expert tracker in the State's rebuttal case. Decker explained that she, Hardin, and a third tracker, Sharon Ward, worked on a team to analyze crime scene photographs. Decker testified that "we were in agreement and still are in agreement to our opinion" that Ashley did not walk across the deck. She continued, "We were not able to see any sign made from [Ashley's] sandal." Zellmer argues that Decker's use of the word "we" constitutes opinion testimony from a witness who did not testify at trial, violating the confrontation clause of the Sixth Amendment and article I, section 22 of the Washington Constitution. However, defense counsel failed to object to Decker's testimony.[8] Therefore, Zellmer has waived the issue absent manifest constitutional error. RAP 2.5(a)(3). Even a manifest constitutional error may be subject to harmless error analysis. Kirkman, 159

---

[8] Zellmer claims that he did object, citing the previous day's transcript. But, defense counsel only objected to the cumulative nature of Decker's testimony, not that she would be testifying about the opinion of a third non-testifying tracker, in violation of the confrontation clause.

Wn.2d at 927. A constitutional error is harmless if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985)

Here, Decker's "we" testimony was harmless. The jury already heard similar testimony from Hardin. And, Zellmer's defense expert mounted a compelling rebuttal undermining Hardin's conclusions that were the same as Decker's. Moreover, Decker's "we" testimony was exceptionally limited in light of Zellmer's entire six week trial. And, she mentioned Ward only once. Decker's testimony is also readily distinguishable from Bullcoming v. New Mexico, __ U.S.__, 131 S. Ct. 2705, 2709, 180 L. Ed. 2d 610 (2011). There, the State's principal evidence was a forensic lab report certifying Bullcoming's high blood alcohol concentration. Id. Instead of calling the certifying analyst, though, the State called another analyst who was familiar with the lab's testing procedures, but had neither participated in nor observed the blood sample test. Id. The Court held that this "surrogate testimony" violated Bullcoming's right to confront witnesses against him. Id. at 2710. In contrast, Decker was not a surrogate analyst—she actively participated in the tracking analysis. She testified about her own conclusions, which corresponded to the team's conclusions. And, her testimony was not the State's principal evidence against Zellmer. Therefore, we hold that any error resulting from Decker's testimony was harmless.

V.    Prosecutorial Misconduct

Zellmer argues that the prosecutor improperly appealed to the jury's sympathy for the victim's family in his closing argument. He contends that these arguments were

outside the evidence and served no valid purpose except to arouse the jury's sympathy for the family and hostility toward him. Prosecutorial misconduct requires a showing that the prosecutor's conduct was both improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). The appellant bears the burden of establishing the impropriety of the statements and their prejudicial effect. State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). The prosecutor's improper statements are prejudicial only where there is a substantial likelihood that the misconduct affected the jury's verdict. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). We must examine the prosecutor's conduct in the full trial context, including the evidence presented, the total argument, and the issues in the case. Monday, 171 Wn.2d at 675.

Prosecutorial misconduct arises when the State refers to evidence outside the record or makes bald appeals to passion or prejudice. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). But, in closing argument, the prosecutor has wide latitude in making arguments to the jury and drawing reasonable inferences from admitted evidence. Anderson, 153 Wn. App. at 427-28. When raised for the first time on appeal, reversal is only required if the conduct was so flagrant and ill-intentioned that no curative jury instruction could have corrected the prejudice. State v. Warren, 165 Wn.2d 17, 43, 195 P.3d 940 (2008).

Zellmer assigns errors to two groups of statements by the prosecutor. The first are toward the beginning of the prosecutor's closing. The prosecutor told the jury that he was not going to replay videos of Ashley taken by her father shortly before she was killed, "because members of little Ashley's family are present." And, the prosecutor told

the jury he would not show them the photos of Ashley's autopsy again, because "I'm sure you can imagine how much pain Ashley's family has been through and we don't need to put them through any more." Defense counsel did not object to these statements. Zellmer makes no argument as to why these statements were flagrant and ill-intentioned, instead addressing the cumulative effect of the prosecutor's statements.

The second group of statements came at the end of the prosecutor's closing argument, after 30 pages of argument in the record. The prosecutor recognized that Zeller is "entitled to his day in court and he's gotten it." But, "[h]e's not the only person deserving of something here." The prosecutor then made the following argument, to which Zellmer assigns error:

> If Ashley McLellan had survived her exposure to the defendant, she would have celebrated her tenth birthday just six days ago.

> If the defendant hadn't taken her life from her, she'd probably be in fourth grade and like any other fourth grader, she'd be putting the last of her baby teeth under the pillow for the tooth fairy, maybe starting to read longer books without as many pictures.

The trial court overruled defense counsel's objection to this line of argument. The prosecutor continued, describing Ashley playing with her little sister or asking her parents for a cell phone. Defense counsel again objected and the court again overruled.

The prosecutor went on to say:

> Stacey would be standing on the sidelines during Ashley's soccer games, tucking her into bed at night, probably turning a night light on on the way out of the room.

> Her dad, Bruce, like any other father, probably would be watching Ashley like any other ten-year-old girl dancing around the room with her

31

> friends to whatever ridiculous Hannah Montana song was big at the moment.
>
> Instead, Stacey and Bruce live with broken hearts for the rest of their lives knowing their daughter was murdered.

Defense counsel objected that this was a claim of compassion. The court noted the objection and overruled.

The prosecutor reiterated that "Stacey and Bruce deserve something now too." He continued with a hypothetical of Ashley's grandparents looking at a photo of their granddaughter's latest artwork on their refrigerator. He said that Ashley's grandparents are "entitled to something now too." Then he finished:

> All of those people and many others you heard in the courtroom have had one of the precious things in their life, maybe the most precious thing in their life, taken from them by the defendant.
>
> . . . .
>
> Her parents are [sic], her grandparents, her aunts and uncles, all the people who loved her, the people of the State of Washington.
>
> . . . .
>
> All those people deserve one thing, they deserve justice. They're entitled to a guilty verdict.

Defense counsel renewed his objection in the middle of these final remarks, but it was again overruled.

Immediately after the prosecutor's argument, the trial court instructed the jury:

> I'm going to remind you yet again of something that we've been telling you from the beginning of the case, that is that the purpose of the trial is to assess whether the State has or has not proved the elements of the charged offense beyond a reasonable doubt.
>
> And that's your objective with that assessment.

The court then dismissed the jury for recess before the defense's closing argument.

Before the jury was brought back in from recess, defense counsel renewed his objections to the prosecutor's closing remarks. He asked the court to instruct the jury that they should not base their decision on appeals to passion or prejudice. The court reminded defense counsel of its limiting instruction to the jury before recess. And, the court explained, that instruction was one "they have gotten very clearly from the first moment they've come into my courtroom that's been repeated for them many times and I'm clear that they understand it." But, the court suggested that defense counsel remind the jury of the instruction that "they may not let their emotions overcome their rational thought process and have to reach their decision based on the law given to them not on sympathy, prejudice, or personal preference." Defense counsel did so shortly after beginning his closing argument.

A trial court's decision on prosecutorial misconduct is given deference on appeal. State v. Luvene, 127 Wn.2d 690, 701, 903 P.2d 960 (1995). This is because the trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced the defendant's right to a fair trial. Id. Here, the trial court believed that the prosecutor's comments were not an appeal to the jury's passion or prejudice. Moreover, the first jury instruction, given right before the State's closing argument, stated, "It is your duty to decide the facts in this case based upon the evidence presented to you during this trial." That same instruction also said, "You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference." Immediately after the prosecutor's closing, the court

33

reminded the jury of the State's burden of proof in an "excess of caution." The court also explained that this instruction was reiterated to the jury throughout trial, so the court was certain "that they understand it." We presume that the jury was able to follow the court's instruction. Warren, 165 Wn.2d at 28.

Examining the prosecutor's comments in the full context of the trial, Zellmer has failed to demonstrate that there is a substantial likelihood that they prejudiced the outcome of his trial.[9] The prosecutor spoke for 30 pages about all the evidence against Zellmer, including how unlikely it was that Ashley would have ventured out in the dark by herself. The prosecutor reminded the jury of prior incidents involving children suspiciously injured in Zellmer's care. And, the prosecutor pointed out inconsistencies in Zellmer's version of events the night of the incident. The comments about the victim and her survivors' losses were not flagrant and ill-intentioned as to warrant a new trial.

## VI. Unanimous Special Verdict Instruction

Zellmer argues that the trial court erroneously instructed the jury that it must be unanimous to answer "no" on the special verdict form supporting an aggravated sentence, in violation of State v. Bashaw, 169 Wn.2d 133, 234 P.3d 195 (2010),

---

[9] The cases that Zellmer cites to the contrary do not control here. First, the cases he cites to argue that the prosecutor may not ask the jury to put itself in the position of the victim's family or ask for justice for the victim's family are both out-of-state cases. State v. Adamcik, 152 Idaho 445, 272 P.3d 417 (2012); Edwards v. State, 428 So. 2d 357 (Fla. Dist. Ct. App. 1983). Second, State v. Pierce is distinguishable. 169 Wn. App. 533, 280 P.3d 1158, review denied, 175 Wn.2d 1025, 291 P.3d 253 (2012). In that case, the prosecutor in closing fabricated an entire interaction between the defendant and his victims just before he murdered them. Id. at 543. The prosecutor also created an internal dialogue the defendant had with himself before deciding to rob and murder the victims, which the prosecutor told in a first person narrative during closing. Id. at 542. Such argument had absolutely no basis in the record and improperly asked the jurors to step into both the victim's and the defendant's the shoes. Id. at 555.

overruled by State v. Nuñez, 174 Wn.2d 707, 285 P.3d 21 (2012). The instruction read, in relevant part: "In order to answer the special verdict form(s) 'yes,' you must unanimously be satisfied beyond a reasonable doubt that 'yes' is the correct answer. If you unanimously have a reasonable doubt as to this question, you must answer 'no.'" The Washington Supreme Court recently overruled Bashaw and expressly upheld an instruction identical to the one given here. Nuñez, 174 Wn.2d at 710. There is no error.

VII. Question from Deliberating Jury

Zellmer argues that the court improperly answered a question from the deliberating jury without apprising him and without an in-court discussion, thereby violating his constitutional right to be present. A criminal defendant has a fundamental right to be present at all critical stages of a trial. State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). The right exists whenever the defendant's presence has a reasonably substantial relation to the fullness of his opportunity to defend against the charge. Id. at 881. The right only exists to the extent that a fair and just hearing would be thwarted by the defendant's absence. Id. Thus, there is no right to be present when the defendant's "'presence would be useless, or the benefit but a shadow.'" Id. (quoting Snyder v. Massachusetts, 291 U.S. 97, 106-07, 54 S. Ct. 330, 78 L. Ed. 674 (1934), overruled in part sub nom Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 489, 12 L. Ed. 2d 653 (1968)). The defendant does not have a right to be present during conferences between the court and counsel on legal matters, unless it requires a resolution of disputed facts. In re Pers. Restraint of Lord, 123 Wn.2d 296, 306, 868 P.2d 835, clarified by, 123 Wn.2d 737, 870 P.2d 964 (1994). So long as defense counsel is present, the trial court is

permitted to give the jury information on a point of law in the defendant's absence. State v. Brown, 29 Wn. App. 11, 16, 627 P.2d 132 (1981).

During deliberations, the jury asked the court:

Is manslaughter in the 1st degree a lesser included offense of murder in the 1st or 2nd degree?

What are the elements of manslaughter in the 1st degree?

Is that an option available to us?

The court conferred with counsel by speakerphone. The court then responded in writing, "In this case, manslaughter in the first degree is not a lesser included offense that you can consider." Whether manslaughter is a lesser included offense of murder is a pure legal issue. Because the trial court consulted with defense counsel, it was permitted to respond to the jury's legal question without Zellmer being present. Any benefit of Zellmer being at this purely legal discussion is not apparent. There was no violation of Zellmer's constitutional right to be present.

## VIII.    Cumulative Error

Zellmer contends that cumulative error affected the outcome of his case. Where several errors standing alone do not warrant reversal, the cumulative error doctrine requires reversal when the combined effects of the errors denied the defendant a fair trial. State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). The only error here was allowing Kathleen Decker to testify briefly about a third non-testifying tracker's opinion. That error was harmless. The cumulative error doctrine does not apply here.

IX. Unsealed Documents

Zellmer argues that the trial court improperly unsealed documents involving his requests for expert funding and claims that his attorney-client privilege was violated. He asserts that the trial court applied the incorrect legal test for determining whether to unseal the documents. The State concedes that when the trial court initially considered the request to unseal records in December 2010, it applied the multi-factor Ishikawa test. But, the court stayed the unsealing so that defense counsel could review the records and make specific redaction requests. In January 2011, the Washington Supreme Court held that unsealing such records should be determined with reference to GR 15(e) rather than the Ishikawa test. Yakima County v. Yakima Herald-Republic, 170 Wn.2d 775, 802-03, 246 P.3d 768 (2011). In light of this new law, Zellmer moved for reconsideration of the trial court's unsealing order. On March 16, 2011, the court denied Zellmer's motion, finding that unsealing was warranted under GR 15(e).

In a supplemental assignment of error, Zellmer argues that the trial court erred in denying his motion for reconsideration, because it did not explain how the State met the GR 15(e) requirements and did not hold an in-court hearing. GR 15(e)(2) provides that a "sealed court record in a criminal case shall be ordered unsealed only upon proof of compelling circumstances." Zellmer argues that the trial court's order stating only that "in the Court's view, the requirements of GR 15 have been met" is insufficient proof of compelling circumstances. Zellmer asks this court to remand the case for a hearing on the issue.

37

However, GR 15(e) nowhere requires the court to hold a hearing to find proof of compelling circumstances. And, Zellmer cites no other statutory authority or case law that requires a court to do so. RAP 10.3(a)(6); State v. McNeair, 88 Wn. App. 331, 340, 944 P.2d 1099 (1997) (failure to cite authority constitutes a concession that the argument lacks merit). Moreover, the trial court stated in the order that it found the GR 15 requirements met based on its consideration of the defense motion and the State's response. The State discussed the compelling circumstances for unsealing at length in its response. Clearly the trial court found this to be sufficient proof of compelling circumstances. No hearing was required.

Zellmer also argues that State v. McEnroe entitles him to an opportunity to withdraw the previously sealed documents containing privileged materials. 174 Wn.2d 795, 279 P.3d 861 (2012). But, Zellmer's reliance on McEnroe is misplaced. The McEnroe court held that only documents submitted with a motion to seal may be withdrawn if the motion is denied. Id. at 798. McEnroe does mean that a defendant has the right to withdraw documents filed under seal if the State later seeks to unseal those documents, as is the case here. There is no error.

We affirm.

WE CONCUR:

38